**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**



YALE M. FISHMAN 1998 INSURANCE
TRUST, Individually and On Behalf of All
Others Similarly Situated,

                Plaintiff,

vs.

AGL LIFE ASSURANCE COMPANY,
RYE SELECT BROAD MARKET
INSURANCE FUND LP, RYE SELECT
BROAD MARKET PRIME FUND LP,
RYE SELECT BROAD MARKET XL
FUND LP, TREMONT CAPITAL
MANAGEMENT, INC., TREMONT
GROUP HOLDINGS, INC., TREMONT
PARTNERS, INC., TREMONT
OPPORTUNITY FUND III, L.P., RYE
INVESTMENT MANAGEMENT,
MASSMUTUAL HOLDING LLC,
MASSACHUSETTS MUTUAL LIFE
INSURANCE CO., OPPENHEIMER
ACQUISITION CORP., ERNST &
YOUNG, LLP, KPMG LLP, ROBERT
SCHULMAN and SANDRA L.
MANZKE,

                Defendants.

No. 11 Civ.

Removed from:

Supreme Court of the State of New
York, County of Nassau

Index No. 601094/2010



BIANCO, J.

LINDSAY, M.J.

### NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1441, 1446 and 1453(b), defendant KPMG LLP ("KPMG"), by

its undersigned attorneys, Sidley Austin LLP, hereby removes the above-captioned civil action,

and all claims and causes of action therein, from the Supreme Court of the State of New York,

County of Nassau, to the United States District Court for the Eastern District of New York.

KPMG appears for the purpose of removal only and for no other purpose and reserves all rights,

claims and defenses of nature whatsoever, including but not limited to defenses related to service

of process, jurisdiction, and venue, and states as follow:

1.  On December 10, 2010, Yale M. Fishman 1998 Insurance Trust ("Fishman") purported to initiate this putative class action by filing a complaint against the defendants in the Supreme Court of the State of New York, County of Nassau, under Index No. 601094/2010, individually and on behalf of all persons or entities that held variable universal life insurance policies issued by AGL Life Insurance Company and managed by Tremont Capital Management, Inc. or Rye Investment Management through December 10, 2008. (Compl. ¶ 1.) Pursuant to Rule 81.1(b) of the Local Civil Rules of the United States Courts for the Southern and Eastern Districts of New York and 28 U.S.C. § 1446(a), a true and correct copy of the summons and complaint (hereinafter "Complaint"), which is the only pleading thus far served upon any of the defendants, is attached hereto as Exhibit A.

2.  A copy of the Complaint was served on KPMG LLP on December 15, 2010.

3.  Fishman alleges breach of fiduciary duty, aiding and abetting, violations of New York General Business Law § 349, gross negligence, negligent misrepresentation, promissory estoppel and unjust enrichment arising out of defendants' alleged mismanagement of Fishman's investments. (Compl. ¶¶ 1-2.)

4.  This case – along with numerous other related actions pending in several different jurisdictions, including, principally, the United States District Court for the Southern District of New York – arises out of the massive fraud committed by Bernard L. Madoff and the subsequent collapse of Bernard L. Madoff Investment Securities LLC ("BMIS").

### TIMELINESS OF REMOVAL

5.  Fishman effected service of process on December 15, 2010, at the earliest. This Notice is therefore timely filed pursuant to 28 U.S.C. § 1446(b).

### GROUNDS FOR REMOVAL

6.  There are two alternative grounds for removal of this action. *First*, under 28 U.S.C. § 1441(b), a party may remove to federal court any action filed in state court that arises under the laws of the United States. As discussed below, this action arises under the laws of the United States because the Securities Litigation Uniform Standard Act of 1998 ("SLUSA"), 15 U.S.C. §

78bb et seq, applies to – and precludes – each of the claims asserted in the complaint. *Second*,

under 28 U.S.C. § 1441(a), a party may remove to federal court any action over which federal

courts have original jurisdiction. *See also* 28 U.S.C. § 1453(b).  As discussed below, to the

extent that SLUSA is inapplicable (and it is applicable), this Court has original jurisdiction of

this action pursuant to Section 4 of the Class Action Fairness Act of 2005 ("CAFA"), Pub. L.

No. 109-2, 119 Stat. 4, codified at 28 U.S.C. § 1332(d).

      7.  SLUSA provides that "Any covered class action brought in any State court involving

a covered security…shall be removable to the Federal district court for the district in which the

action is pending[.]"  15 U.S.C. § 78bb(f)(2).

      8.  SLUSA was enacted in 1998 to prevent class action plaintiffs from circumventing the

heightened pleading requirements under the Private Securities Litigation Reform Act of 1995

("PSLRA") through artful pleading. *Ring v. AXA Fin., Inc.*, 483 F.3d 95, 97-98 (2d Cir. 2007).

The PSLRA "raised the bar" for securities fraud lawsuits, which had the unintended consequence

of directing plaintiffs to state court, where they attempted to avoid the PSLRA by characterizing

their allegations as state law claims. *Id.*  SLUSA was intended to reverse that trend by

forbidding the filing of certain types of class actions in state courts. *Barron v. Igolnikov*, 2010

U.S. Dist. LEXIS 22267, at **8-10 (S.D.N.Y. Mar. 10, 2010); *see also Lander v. Hartford Life*

*& Annuity Ins. Co.*, 251 F.3d 101, 108 (2d Cir. 2001) (SLUSA was passed to "close this

loophole" by "making federal court the exclusive venue for class actions alleging fraud in the

sale of certain covered securities and by mandating that such class actions be governed

exclusively by federal law.").

      9.  For an action to be removed to federal district court under SLUSA, the following five

requirements must be met:  (1) the suit is a "covered" class action; (2) the action purports to be

based on state or local law; (3) the action is based on allegations of material misrepresentations

and omissions; (4) the action concerns a "covered security;" and (5) the action alleges that

defendants misrepresented or omitted a material fact or employed a manipulative device or

contrivance "in connection with the purchase or sale" of that security. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 83 (2006). These requirements are met here.

10. **This suit is a covered class action.** An action is a covered class action for SLUSA purposes if it involves questions of law or fact that predominate over questions affecting any individual persons and is brought (1) on behalf of more than 50 persons or prospective class members, or (2) one or more named parties seek damages on a "representative basis on behalf of themselves and other unnamed parties similarly situated." 15 U.S.C. § 78bb(f)(5)(B)(i). This action is a covered class action under both definitions. Fishman purports to represent a putative class of "all persons or entities that held variable universal life insurance policies...issued by AGL" and managed by Tremont Capital Management, Inc. or Rye Investment Management through December 10, 2008 (Compl. ¶ 1) and Fishman states "there are thousands of members of the Class" (*id.* ¶ 73). Further, Fishman asserts there are "numerous questions of law and fact which are common to the Class and which predominate over any questions affecting individual members . . . ." (*Id.* ¶ 75). Fishman also alleges the complaint was filed to recover damages (*id.* ¶ 10) "on behalf of all persons or entities that held variable universal life insurance policies" issued by AGL (*id.* ¶ 1; *see also id.* ¶ 72). Thus, this action is a covered class action.

11. **Plaintiffs assert state law claims.** This action is based on "the statutory or common law of any State," as required under SLUSA. 15 U.S.C. § 78bb(f)(1). Fishman asserts claims under New York statutory law pursuant to § 349 of the New York General Business Law (fourth cause of action). Fishman also alleges a number of state common law claims, including breach of fiduciary duty (first cause of action), aiding and abetting (second and third causes of action), gross negligence (fifth cause of action), negligent misrepresentation (sixth cause of action), unjust enrichment (seventh cause of action) and promissory estoppel (eighth cause of action).

12. **The action is based on allegations of material misrepresentations and omissions.** Fishman alleges his damages are based on false and misleading statements. A complaint is subject to SLUSA when it alleges "(1) an explicit claim of fraud or misrepresentation (e.g., common law fraud, negligent misrepresentations, or fraudulent inducement), or (2) other garden-

4

variety state law claims that 'sound in fraud.'" *Levinson v. PSCC Servs., Inc.*, 2009 U.S. Dist. LEXIS 119957, at *36 (D. Conn. Dec. 22, 2009) (*citing Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*, 341 F. Supp. 2d 258, 261 (S.D.N.Y. 2004) Fishman asserts two causes of action against KPMG: negligent misrepresentation (sixth cause of action) and aiding and abetting (third cause of action). Negligent misrepresentation is an "explicit claim of fraud or misrepresentation," and is thus subject to SLUSA removal. *Levinson*, 2009 U.S. Dist. LEXIS 119957, at *36. The only other cause of action against KPMG, aiding and abetting, sounds in fraud. The aiding and abetting claim incorporates by reference all preceding allegations in the complaint (Compl. ¶ 88), including allegations of misrepresentations in the PPM and annual audit reports. *Levinson*, 2009 U.S. Dist. LEXIS 119957, at *39 (finding applicability of SLUSA where the non-fraud based causes of action incorporated by reference all preceding allegations, including allegations of misrepresentations and noting that "[c]ourts have held that non-fraud-based claims are preempted by SLUSA if they incorporate by reference allegations of false or misleading statements. The 'counts which alleged fraud or misrepresentation . . . taint[] subsequent counts in the complaint.'") (*quoting Breakaway Solutions, Inc. v. Morgan Stanley & Co.*, 2004 Del. Ch. LEXIS 125 (Del. Ch. Aug. 27, 2004)). The Complaint alleges that KPMG "issued false statements" in its annual audit reports by stating that the audits it performed were in accordance with GAAS (Compl. ¶¶ 68-69) and that Fishman relied on those statements (Compl. ¶¶ 106-107). It also alleges that defendants "misled" Fishman by issuing the PPM and the partnership agreement for the Tremont Opportunity Fund because "the investments made by it of Plaintiff's and other Class members' funds were not ultimately invested pursuant to the investment strategy" detailed in those documents. (Compl. ¶ 36). Furthermore, Fishman claims defendants included "untrue statements of material facts" and/or omissions concerning the value of their policies. (Compl. ¶ 105.) The Complaint also alleges that "AGL conveyed the false impression that it conducted a thorough investigation and due diligence review" of the fund managers, but that "[i]n reality, AGL did not conduct a comprehensive due diligence review and ignored the warnings that would have alerted it to Madoff's Ponzi scheme." (Compl. ¶ 37.)

5

Thus, because these allegations of misrepresentations are incorporated in the aiding and abetting claim, that claim must be removed under SLUSA. Similarly, the allegations of misrepresentations are incorporated in the remainder of the claims against all other defendants, and therefore those claims must be removed under SLUSA as well. (Compl. ¶¶ 77, 84, 93, 98, 102, 110, 115.)

13. **The action involves "covered" securities.** A security is considered "covered" for SLUSA purposes if it meets the definition of covered security under § 18(b) of the Securities Act at the time the misrepresentation, omission, manipulative act or deceptive conduct is alleged to have occurred. 15 U.S.C. § 78bb(f)(5)(E). A covered security includes any security listed or authorized for listing on the New York Stock Exchange or another national exchange, and also includes securities issued by investment companies registered with the SEC. 15 U.S.C. § 77r(b). The covered security requirement is satisfied here for two independent reasons.

14. *First*, Fishman alleges that the class "held variable universal life insurance policies," (Compl. ¶ 1) which are covered securities. *Lander*, 251 F.3d at 104 (holding that variable life annuities were "covered securities" under SLUSA). The Supreme Court has held that variable annuities are securities within the scope of the federal securities laws, *see SEC v. Variable Annuity Life Ins. Co. of Am.*, 359 U.S. 65, 69-73 (1959), and the Second Circuit and other federal courts have concluded that variable annuities are "covered securities" under SLUSA. *See, e.g., Lander*, 251 F.3d at 104 (holding that class members "who purchased variable annuity policies . . . in connection with a tax-qualified investment plan" were subject to SLUSA preemption); *see also Ring*, 483 F.3d at 99 (noting that SLUSA applies to variable insurance policies); *Herndon v. Equitable Variable Life Ins. Co.*, 325 F.3d 1252, 1254-55 (11th Cir. 2003) ("variable life insurance" is a "covered security" under SLUSA); *Araujo v. John Hancock Life Ins. Co.*, 206 F. Supp. 2d 377, 382 (E.D.N.Y. 2002) (same); *In re Lutheran Bhd. Variable Ins. Prods.*, 105 F. Supp. 2d 1040 (D. Minn. 2000) (same); *Lasley v. New England Variable Life Ins. Co.*, 126 F. Supp. 2d 1236, 1238-39 (N.D. Cal. 1999) (same).

15. The variable universal life insurance policies Plaintiffs allegedly purchased are covered securities because they "possess characteristics akin to those of investment securities." *Lander*, 251 F.3d at 105. Most importantly, the holder of the policy "bears the investment risk of the underlying securities" because the policy contains an underlying investment component. *Id.* The Complaint here makes clear that one of the "risks associated with these policies" is that "poor performance could require increasing premiums to keep the policies in force." (Compl. ¶ 28.) Also, the AGL policies purportedly stated that the "'investment strategy'" was "'to invest with various portfolio managers'" to meet the objective of "achiev[ing] long-term capital appreciation and consistently generate positive returns…" (Compl. ¶ 30.)

16. The *Lander* court recognized that variable universal life insurance policies are covered securities and even though the policies are sold by insurance companies, the policies "must be offered through 'separate accounts.'" *Lander*, 251 F.3d at 105; *see also id.* at 109 (holding that the Supreme Court "conclusively" determined that variable annuities are "securities"). Here, consistent with *Lander*, the policyholder's funds are invested in and through separate "optional investment accounts." (Compl. ¶ 27.) Also, Fishman and the purported class members had the right to "choose where the premiums that they paid would be invested," and "allocated the annual net premium payment to an investment account option." (*Id.* ¶ 29; *see also* ¶ 33 (policyholders "could opt to have the insurance company invest their premiums in the Tremont Opportunity Fund.").) Thus, in accordance with Second Circuit precedent, the variable universal life insurance policies are covered securities under SLUSA.

17. *Second*, not only are the variable universal life insurance policies "covered securities" themselves, but the policies were also invested in funds that invested in covered securities, which provides a separate and independent basis for removal under SLUSA. Fishman alleges that his investment in the variable universal life insurance policy included investments with the Fund, which included "trades in…equity stocks" and that the Fund's investment manager employed a "'split-strike conversion strategy'" that involved "the purchase of equity shares in a given company; (ii) the sale of 'call' options, which give the investor the right to buy a stock at fixed

7

prices; and (iii) the purchase of 'put' options, which allow the investor to sell at fixed prices."
(Compl. ¶ 4.)  These allegations make plain that the objective of the policies was to invest in
funds that "manage[d] Plaintiffs' investment using a strategy that inevitably included the
purchase and sale of covered securities." *In re Beacon Assocs. Litig.*, 2010 U.S. Dist. LEXIS
106355, at *119 (S.D.N.Y. Oct. 5, 2010) (finding claims covered by SLUSA where plaintiffs
invested in funds that invested in Madoff and noting, "[t]here is 'no question that Madoff's Ponzi
scheme was 'in connection with' the purchase and sale of securities.'") (quoting *Levinson*, 2009
U.S. Dist. LEXIS 119957, at *26).  Thus, the Complaint alleges that the action involves
"covered" securities.

   18.  **The complaint alleges misconduct "in connection with" the purchase or sale of**
**covered securities.**  SLUSA removal requires that allegations of fraud be "in connection" with
the purchase or sale of a covered security.  15 U.S.C. § 78bb(f)(1).  The Supreme Court has
determined that the "in connection" requirement should be interpreted broadly.  *Dabit*, 547 U.S.
at 85.  In order for a plaintiff's claim to be "in connection with" the purchase or sale of a security
for SLUSA purposes, "it is enough that the fraud alleged 'coincide' with a securities transaction
– whether by the plaintiff or by someone else."  *Id.* at 85-86; *see also Barron*, 2010 U.S. Dist.
LEXIS 22267, at *11 ("[t]he requisite showing is deception in connection with the purchase or
sale of any security, not deception practiced against a particular purchaser or seller.").  Applying
*Dabit*, courts have held that the "in connection with" prong is satisfied where, as here, the
defendant accused of fraudulent conduct did not itself buy and sell securities.[1]  *See, e.g., Gray v.*
*Seaboard Sec., Inc.*, 126 F. App'x 14 (2d Cir. 2005) (holding that misrepresentations concerning
the source of investment advice were in connection with the purchase and sale of securities).

---

[1] The "in connection with" requirement is also satisfied even if a purchase or sale of securities never transpired. *See*
*In re Beacon Assocs. Litig.*, 2010 U.S. Dist. LEXIS 106355, at *119; *see also Barron*, 2010 U.S. Dist. LEXIS
22267, at *11 ("it is not necessary that the purchase or sale actually transpired; claims based on the alleged failure to
buy or sell covered securities fall squarely within SLUSA's ambit"); *Levinson*, 2009 U.S. Dist. LEXIS 119957, at
*9; *Schnorr v. Schubert*, 2005 U.S. Dist. LEXIS 45757 (W.D. Okla. Aug. 18, 2005) (SLUSA applied where
defendants engaged in Ponzi scheme and promised to invest putative class's money in securities, but never executed
any trades).

The Complaint makes clear that Fishman's allegations concern purported fraud "in connection with" the purchase or sale of a covered security.

19. *First*, the "in connection with" prong is satisfied with regards to the variable insurance policy because Fishman alleges that AGL "conveyed the false impression that it conducted a thorough investigation and due diligence review" of the managers of the fund the variable life insurance premiums were to be invested in, but "[i]n reality, AGL did not conduct a comprehensive due diligence review and ignored the warnings that would have alerted it to Madoff's Ponzi scheme." (Compl. ¶ 37.) *See, e.g., In re Beacon Assocs. Litig.*, 2010 U.S. Dist. LEXIS 106355, at *120 (finding SLUSA preemption where plaintiffs allege false and misleading statements and omissions regarding "'Defendants' due diligence and monitoring of Madoff and BMIS,' including 'the performance and feasibility of Madoff's purported trading strategy.'") Further, Fishman asserts that "[i]n connection with [its] selection of investment alternatives under the policy," AGL provided it with the Tremont Opportunity Fund Private Placement Memorandum (Compl. ¶ 31), which contained misleading statements about AGL's investments of Fishman's funds, and that the funds were ultimately invested in Madoff and were "subject to Madoff's Ponzi scheme." (Compl. ¶ 36.) *See Backus v. Conn. Comm. Bank, N.A.*, 2009 U.S. Dist. LEXIS 119955, at *24 (D. Conn. Dec. 22, 2009) (one "guidepost" in determining "in connection with" is "whether the covered class action alleges a 'fraudulent scheme' that 'coincides' with the purchase or sale of securities") (quoting *Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294 (3d Cir. 2005)). Fishman further asserts that defendants included "untrue statements of material facts" and/or omissions concerning the value of their policies. (Compl. ¶ 105.) Fishman also alleges that AGL "collected [management] fees improperly" (Compl. ¶¶ 57-58) and it seeks to "recoup" these fees (Compl. Prayer for Relief ¶ D). *See, e.g., Rowinski*, 398 F.3d at 301 ("the relief sought by plaintiffs – such as the recovery of investment losses or trading fees – may be relevant in 'connecting' the allegations to the purchase or sale of securities"). These allegations are sufficient to satisfy the SLUSA "in connection with" requirement.

20. *Second*, Fishman's allegations of misconduct concerning its investment in the Tremont fund, which invested in BMIS, is also "in connection with" a covered security. Numerous cases in this circuit have held that allegations of fraud concerning investments in funds that invested in Madoff, who purportedly invested in "covered securities," are considered "in connection with" covered securities for SLUSA purposes. *See, e.g., Wolf Living Trust v. FM Multi-Strategy Inv. Fund, LP*, 2010 U.S. Dist. LEXIS 118169 (S.D.N.Y. Nov. 2, 2010) (finding SLUSA applicable where plaintiffs purchased limited partnership interests in fund that invested in funds that invested in BMIS); *Newman v. Family Mgmt. Corp.*, 2010 U.S. Dist. LEXIS 111589, at *33 (S.D.N.Y. Oct. 20, 2010) ("misrepresentations related to non-covered limited partnership interests may be nonetheless 'in connection with' covered securities where the Funds were created for the purpose of investing in such securities, and the misrepresentations 'had the effect of facilitating Madoff's fraud.'"); *In re Beacon Assocs. Litig.*, 2010 U.S. Dist. LEXIS 106355, at *120-21 ("[a]lthough the shares of the Beacon Fund are not covered securities, the objective of the fund was to manage Plaintiffs' investment using a strategy that inevitably included the purchase and sale of covered securities. . . . These allegations are sufficient to meet SLUSA's broad requirement of a misrepresentation or omission *in connection with* the purchase or sale of a covered security.") (emphasis added); *Barron*, 2010 U.S. Dist. LEXIS 22267, at *13 (S.D.N.Y. Mar. 10, 2010) (finding SLUSA applicable where plaintiff and putative class members "purchased limited partnership interests in the UBP funds – which in turn invested in covered securities – rather than covered securities directly from Madoff" because "the securities transaction need not have been performed by plaintiff. Rather, it is only necessary to demonstrate deception in connection with the purchase or sale of a covered security, not the deception of plaintiff herself"); *see also Levinson*, 2009 U.S. Dist. LEXIS 119957 (D. Conn. Dec. 22, 2009) (SLUSA applicable where defendants placed plaintiffs' retirement proceeds into

10

a collective fund that invested with Madoff and BMIS and subsequently ignored purported 'red flags' that should have alerted them to Madoff's Ponzi scheme.)[2]

21. Fishman alleges that KPMG "issued false statements" in its annual audit reports by stating that the audits it performed were in accordance with GAAS (Compl. ¶¶ 68-69) and that KPMG knew the reports would be relied on by "by Tremont and its investors." (Compl. ¶ 106). Fishman also alleges that defendants "misled" Plaintiffs by issuing the private placement memorandum and the partnership agreement for the Tremont Opportunity Fund because "the investments made by it of Plaintiff's and other Class members' funds were not ultimately invested pursuant to the investment strategy" included in those documents, rather "these funds were subject to Madoff's Ponzi scheme by which the funds were not invested, but held by Madoff and ultimately lost." (Compl. ¶ 36). *See, e.g., Newman*, 2010 U.S. Dist. LEXIS 111589, at *35 (finding allegations of misrepresentations regarding investment strategies in the offering materials of fund that invested in fund that invested in BMIS to be "in connection with the purchase or sale of a covered security"). Furthermore, Fishman also claims that defendants "conveyed the false impression that it conducted a thorough investigation and due diligence review," when defendants purportedly did not conduct such a review. (Compl. ¶ 37; *see also* ¶¶ 45-46 (alleging that Tremont's website states that it performs "careful due diligence" but that "[t]his due diligence was simply not performed.") *See, e.g., In re Beacon Assocs. Litig.*, 2010 U.S. Dist. LEXIS 106355, at *120 (finding SLUSA preemption where plaintiffs allege false and misleading statements and omissions regarding "'the investment strategies and objectives" of the

---

[2] A few cases related to the Madoff fraud were not removed under SLUSA, but those cases are distinguishable from the case here. In *Tuttle v. Sky Bell Asset Mgmt., LLC*, the Court determined state law claims for mismanagement of investment funds, such as breach of fiduciary duty, were not subject to SLUSA because the claims "lack[] any reference to material omissions or misrepresentations." 2010 U.S. Dist. LEXIS 127839, at *9 (N.D. Cal. Nov. 19, 2010). As explained above, the complaint here alleges a number of misrepresentations. In *Anwar v. Fairfield Greenwich Ltd.*, the Court determined there was no SLUSA preemption but, in contrast to this case, noted that "the policy objectives of SLUSA are not implicated in this case" because "Plaintiffs successfully press federal securities law claims against many of the Defendants and have not attempted to bypass the higher pleading requirements required for these claims by resorting to more lenient state law." 2010 U.S. Dist. LEXIS 86716, at *50 (S.D.N.Y. Aug. 18, 2010). Plaintiff here has not brought federal securities law claims against the defendants, and does appear to be bypassing the higher pleading requirements by resorting to state law.

Fund, and "'Defendants' due diligence and monitoring of Madoff and BMIS,' including 'the performance and feasibility of Madoff's purported trading strategy.'") (citation omitted). Additionally, the Complaint clearly alleges that the defendants' misrepresentations induced Fishman to invest in the Tremont Opportunity Fund, to Fishman's detriment. (Compl. ¶¶ 31-37). *Levinson*, 2009 U.S. Dist. LEXIS 119957, at *29 ("in connection with" requirement met where allegations of misrepresentations "induce[d] an investment of funds to the investor's detriment.") These allegations are sufficient to meet the SLUSA requirement regarding misrepresentations in connection with the purchase or sale of a covered security.[3]

## B. Removal Pursuant to CAFA

22. Even if removal was not appropriate under SLUSA, removal would be appropriate under CAFA.[4] Removal under CAFA requires: (1) putative class, as alleged, consists of more than 100 members; (2) the citizenship of at least one putative class member is different from that of at least on defendant; and (3) the matter in controversy, when the claims of the putative class members are aggregated, exceeds $5 million, exclusive of interests and costs. 28 U.S.C. §§ 1332(d), 1453.[5]

23. **This is a purported class action consisting of more than 100 members.** As alleged, this case is a putative "class action" subject to CAFA jurisdiction, because it was filed as a purported class action, the Complaint details "Class Action Allegations" (Compl ¶¶ 72-76), and Fishman seeks judgment "declaring this action to be a proper class action" (Compl. Prayer for Relief ¶ A). Furthermore, the Complaint alleges it is "a class action" filed by Plaintiff "on behalf

---

[3] The alleged misrepresentations do not need to "contain specific securities information or investment advice in order to coincide with securities transactions." *Levinson*, 2009 U.S. Dist. LEXIS 119957, at *28.

[4] Removal of a state court action to a federal court is possible under SLUSA and CAFA. However, SLUSA and CAFA cover different, and mutually exclusive, categories of securities. KPMG maintains that the complaint in this case asserts claims concerning SLUSA-covered securities and that this action should be removed pursuant to SLUSA. But, even if the Court determines that SLUSA is not applicable, removal would be proper under CAFA. CAFA authorizes the removal of securities-related class action that are not removable under SLUSA. SLUSA and CAFA work together to "assure that the federal courts are available for all securities cases that have national impact." *Estate of Pew v. Cardarelli*, 527 F.3d 25, 32 (2d Cir. 2008).

[5] Defendants deny the class allegations and assume the accuracy only for the removal.

of all persons or entities that held variable universal life insurance policies" issued by AGL (Compl. ¶ 1; *see also id.* ¶ 72).  The complaint also alleges that the purported class comprises of "thousands of members." (Compl. ¶ 73.)

24. **Minimum diversity is satisfied.**  Minimum diversity of citizenship exists because the citizenship of at least one putative class member is different from that of at least on defendant. 28 U.S.C. § 1332(d)(2)(A).  Here, Fishman states he is a citizen of New York (*See* Summons) and further alleges, for example, that defendant Massachusetts Mutual Life Insurance Co.'s citizenship is Massachusetts (Compl. ¶ 20).  28 U.S.C. § 1332(d)(10).

25. **The matter in controversy exceeds $5 million.**  While KPMG denies that Plaintiffs are entitled to recover any amount, the amount in controversy exceeds $5 million.  Fishman and the "thousands" of purported class members seek to recover damages allegedly sustained based on investments in the variable life insurance policies, as well as "fees and other amounts wrongfully paid to Defendants." (Compl. ¶ 10.)  Fishman asserts that the management fees alone amount to "millions of dollars." (*Id.* ¶ 9.)  These fees, moreover, are only a "percentage of the funds' net asset value," and Plaintiff claims that the class had its "investment accounts wiped out." (*Id.* ¶¶ 57, 64.)  Additionally, the putative class seeks punitive damages (*id.* ¶ 83) as well as attorneys' fees (*id.* at Prayer for Relief ¶ C).  Accordingly, the amount in controversy exceeds $5 million.

26. If the Court were to find SLUSA inapplicable here, none of the exceptions to removal under CAFA would apply to this case.  *See* 28 U.S.C. §§ 1332(d)(9)(A-C).

## VENUE IS PROPER IN THIS DISTRICT

27. Venue is proper in this District under 28 U.S.C. §§ 1441(a) (and 15 U.S.C. § 78bb(f)(2), "Removal of Covered Class Actions," added by SLUSA) because this District is the "district and division embracing" Nassau County, New York. 28 U.S.C. § 101.  KPMG reserves the right to seek the transfer of this matter to another district.

28. In accordance with 28 U.S.C. § 1446(a), attached hereto as Exhibit A are copies of all process, pleadings and orders served upon defendants in the state court action.

29. KPMG promptly will serve a copy of this Notice of Removal on counsel for Plaintiff, and will fie a copy of this Notice of Removal with the Clerk of the Supreme Court of the State of New York, County of Nassau, pursuant to 28 U.S.C. § 1446(d).

30. By filing this Notice of Removal, defendants are not making a general appearance and are not waiving their rights to raise any defenses and/or grounds for dismissal pursuant to Rule 12 of the Federal Rules of Civil Procedure, or otherwise, including without limitation personal jurisdiction.

31. All named defendants assent to removal of this action. (*See* Exhibit B (Notice of Consent to Removal).)

WHEREFORE, Defendants under 28 U.S.C. §§ 1332 and 1441, as amended in relevant part by CAFA, and authorized by 28 U.S.C. § 1453, respectfully request that this action be removed in its entirety from the Supreme Court of the State of New York, County of Nassau, to the United States District Court for the Eastern District of New York.

Dated:  New York, New York
      January 13, 2011

SIDLEY AUSTIN LLP

By:                              
    Gary F. Bendinger
    Gregory G. Ballard
    Gazeena K. Soni
    787 7th Avenue
    New York, New York 10022
    Tel.: (212) 839-5662
    Fax: (212) 839-5599
    Email: gbendinger@sidley.com
    Email: gballard@sidley.com
    Email: gsoni@sidley.com
    *Attorneys for Defendant KPMG LLP*

    WILLIAMS & CONNOLLY LLP
    725 Twelfth Street, N.W.
    Washington, D.C. 20005
    scady@wc.com

    *Of Counsel for Defendant KPMG LLP*

# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

———————————————————— x

|  |  |
|---|---|
| YALE M. FISHMAN 1998 INSURANCE TRUST, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff , <br><br>vs.<br><br>AGL LIFE ASSURANCE COMPANY, RYE SELECT BROAD MARKET INSURANCE FUND LP, RYE SELECT BROAD MARKET PRIME FUND LP, RYE SELECT BROAD MARKET XL FUND LP, TREMONT CAPITAL MANAGEMENT, INC., TREMONT GROUP HOLDINGS, INC., TREMONT PARTNERS, INC., TREMONT OPPORTUNITY FUND III, L.P., RYE INVESTMENT MANAGEMENT, MASSMUTUAL HOLDING LLC, MASSACHUSETTS MUTUAL LIFE INSURANCE CO., OPPENHEIMER ACQUISITION CORP., ERNST & YOUNG, LLP, KPMG LLP, ROBERT SCHULMAN and SANDRA L. MANZKE,<br><br>Defendants. | Index No.:<br><br>Date Purchased:<br><br>Plaintiff designates Nassau County as the place of trial.<br><br>The basis of the venue is Plaintiff's Residence<br><br>**SUMMONS**<br><br>Plaintiff(s) resides at 930 Broadway Woodmere, NY 11598 |

———————————————————— x

To the above named Defendants:

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

DATED:     Melville, New York          ROBBINS GELLER RUDMAN & DOWD LLP
           December 10, 2010

By:     SAMUEL H. RUDMAN
        DAVID A. ROSENFELD
        MARIO ALBA, JR.
        EDWARD Y. KROUB

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

Attorneys for Plaintiff

Defendant's address:

AGL Life Assurance Company
610 West Germantown Pike, Suite 460
Plymouth Meeting, Pennsylvania 19462

Rye Select Broad Market Insurance Fund LP
555 Theodore Fremd Avenue
Rye, New York 10580

Rye Select Broad Market Prime Fund LP
555 Theodore Fremd Avenue
Rye, New York 10580

Rye Select Broad Market XL Fund LP
555 Theodore Fremd Avenue
Rye, New York 10580

Tremont Capital Management, Inc.
555 Theodore Fremd Avenue
Rye, New York, 10580

Tremont Group Holdings, Inc.
555 Theodore Fremd Avenue
Rye, New York, 10580

Tremont Partners, Inc.
555 Theodore Fremd Avenue
Rye, New York, 10580

Tremont Opportunity Fund III
555 Theodore Fremd Avenue
Rye, New York, 10580

Rye Investment Management
555 Theodore Fremd Avenue
Rye, New York 10580

Massmutual Holding LLC
1295 State Street
Springfield, Massachusetts 01111

Massachusetts Mutual Life Insurance Co.
1295 State Street
Springfield, Massachusetts 01111

Oppenheimer Acquisition Corp.
2 World Financial Center
New York, New York, 10281

KPMG LLP
757 Third Avenue
New York, New York 10017

Ernst & Young
5 Times Square
New York, New York 10036

Robert Schulman
1 Fifth Avenue, Apt 16J
New York, New York 10003

Sandra L. Manzke
12 Bishop Park Road
Pound Ridge, New York 10576

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

———————————————————— X
                             :

YALE M. FISHMAN 1998 INSURANCE    :  Index No.
TRUST, Individually and On Behalf of All  :
Others Similarly Situated,              :  <u>CLASS ACTION</u>
                             :
                 Plaintiff,  :  COMPLAINT FOR BREACH OF
                             :  FIDUCIARY DUTY, AIDING AND
    vs.                           :  ABETTING, VIOLATIONS OF NEW YORK
                             :  GENERAL BUSINESS LAW §349, GROSS
AGL LIFE ASSURANCE COMPANY, RYE  :  NEGLIGENCE, NEGLIGENT
SELECT BROAD MARKET INSURANCE  :  MISREPRESENTATION, UNJUST
FUND LP, RYE SELECT BROAD MARKET :  ENRICHMENT AND PROMISSORY
PRIME FUND LP, RYE SELECT BROAD   :  ESTOPPEL
MARKET XL FUND LP, TREMONT      :
CAPITAL MANAGEMENT, INC.,       :
TREMONT GROUP HOLDINGS, INC.,   :
TREMONT PARTNERS, INC., TREMONT :  <u>DEMAND FOR JURY TRIAL</u>
OPPORTUNITY FUND III, L.P., RYE    :
INVESTMENT MANAGEMENT,        :
MASSMUTUAL HOLDING LLC,        :
MASSACHUSETTS MUTUAL LIFE     :
INSURANCE CO., OPPENHEIMER     :
ACQUISITION CORP., ERNST & YOUNG, :
LLP, KPMG LLP, ROBERT SCHULMAN :
and SANDRA L. MANZKE,         :
                             :
               Defendants.  :
———————————————————— X

## NATURE OF ACTION

1.     This is a class action filed by the Yale M. Fishman 1998 Insurance Trust ("Plaintiff"),

individually and on behalf of all persons or entities that held variable universal life insurance policies

("Policy" or "Policies") issued by AGL Life Assurance Company ("AGL") and managed by

Tremont Capital Management, Inc. ("Tremont Capital") or Rye Investment Management ("Rye")

through December 10, 2008 (the "Class").  This class action is filed against Defendants (defined

below) for breach of fiduciary duty, aiding and abetting, violations of New York General Business

Law §349, gross negligence, negligent misrepresentation, promissory estoppel and unjust

enrichment, which have caused damage to Plaintiff and the Class.

2.     This action arises out of Defendants' causing and knowingly permitting Plaintiff's

and the Class' Policies, premiums, cash values and their associated death benefits, to be invested in

the Tremont Opportunity Fund III, L.P. ("Tremont Opportunity Fund"), which was invested in the

Rye Select Broad Market Insurance Fund LP, Rye Select Broad Market Prime Fund LP, and Rye

Select Broad Market XL Fund LP (collectively, the "Rye Select Funds"), that were ultimately

managed or sub-managed by Bernard L. Madoff ("Madoff") and/or Bernard L. Madoff Investment

Securities LLC ("BMIS").  As a direct result of Defendants' actions, Plaintiff and the Class have

suffered damages and/or have lost a substantial amount of their investments.

3.     Madoff offered his investors a modest but steady double-digit "return" in both up and

down markets.  Madoff, however, admitted that he "paid investors with money that wasn't there"

after he was arrested by the Federal Bureau of Investigation ("FBI") on December 11, 2008, on

criminal charges of securities fraud.  Madoff's business was in fact "a giant Ponzi scheme" and he

estimated the losses from his massive fraud to be $65 billion.

4.     Madoff's consistent double-digit returns and his investment strategy were unable to

be replicated by rival fund managers, despite numerous attempts.  Madoff's strategy, as described in

BMIS's quarterly reports and "Offering Memorandum," incorporated trades in both equity stocks and options using a "split-strike conversion" strategy. In basic terms, the strategy involved: (i) the purchase of equity shares in a given company; (ii) the sale of "call" options, which give the investor the right to buy a stock at fixed prices; and (iii) the purchase of "put" options, which allow the investor to sell at fixed prices. In reality, however, this strategy was never implemented and Madoff merely paid certain senior investors with the investments already received from other junior investors.

5.    Defendants knowingly, recklessly and/or negligently ignored numerous "red flags" that could have alerted them to the fact that Madoff was running an illegitimate and illegal Ponzi scheme through BMIS. These "red flags" included:

(a)    the fact that Madoff offered consistent investment returns, beyond reasonable investment benchmarks, in both up and down markets;

(b)    the fact that there was a discrepancy between the trading activity in which Madoff claimed to be buying and selling puts and calls and the open interest of index option contracts;

(c)    the fact that BMIS was audited by a small operation owned by Madoff's brother-in-law as opposed to the 90% of single strategy hedge funds that are audited by one of the top 10 auditors;

(d)    the fact that Madoff did not employ any third party administrators and custodians;

(e)    the fact that Madoff ran his own back office operations – *i.e.,* the calculation of net asset values, the preparation of account statements, etc.;

(f)    the fact that Madoff lacked transparency and limited access to his books and records, thereby maintaining a false appearance of exclusivity; and

- 2 -

(g)      the fact that Madoff admitted to illegally manipulating his accounting records by personally subsidizing returns in slow quarters in order to minimize risk and to maximize reported performance.

6.      Importantly, these "red flags" were in fact recognized by numerous other investment advisors in the industry.  Indeed, many investment advisors, investment banks and pension funds – *i.e.,* JPMorgan Chase & Co., the Fort Worth Employees' Retirement Fund ("Fort Worth") and Acorn Partners – took the time and effort to conduct comprehensive and proper due diligence reviews, and, as a result of these warning signs, chose not to invest with Madoff or any of his affiliated funds.  In stark contrast, Defendants failed to even conduct a basic due diligence review that would have alerted them of Madoff's fraudulent scheme.

7.      Madoff's fraudulent scheme was perpetrated by a network of "feeder funds" that, knowingly or unknowingly, enabled Madoff to evolve from an ordinary asset manager for individual clients to a wholesale manager of billions of dollars.  Seven of Madoff's top feeder funds had $25 billion in assets invested in him.

8.      Ignoring the "red flags" identified above, Defendant Tremont, as defined herein, acted as a "feeder fund" to Madoff by investing and/or permitting Plaintiff's and the Class' monies and/or Policies to be invested with Madoff and his affiliates.  Defendants knowingly or recklessly provided investors with the option of investing in the Tremont Opportunity Fund without undertaking a comprehensive and proper due diligence review to assess the risks involved.

9.      Moreover, Defendants profited generously from this arrangement by unjustly receiving millions of dollars in management fees for merely entrusting and/or re-depositing their clients' funds with a sub-manager – *i.e.,* Madoff and/or BMIS.  This wanton conduct directly caused Plaintiff and the Class to suffer losses.

- 3 -

10.     Plaintiff and the Class hereby seek to recover damages as well as all fees and other amounts wrongfully paid to Defendants. The management fees paid in error, and based on mistaken information, should be returned to Plaintiff and the Class. These avoidable losses were suffered as a direct result of Defendants' breach of fiduciary duty, aiding and abetting, violations of New York General Business Law §349, gross negligence, negligent misrepresentation, promissory estoppel and unjust enrichment.

## PARTIES

11.     Plaintiff Yale M. Fishman 1998 Insurance Trust is a contract holder of Policies issued by AGL. Pursuant to its Policy, Plaintiff entrusted certain monies to AGL, which were invested in the Tremont Opportunity Fund that was managed by Tremont Group Holdings, Inc. ("TGH") and Tremont Partners, Inc. ("Tremont Partners"). Plaintiff purchased two Policies issued by AGL in February 2000 and February 2001, respectively.

12.     Defendant AGL is an insurance and financial services organization having a principal office at 610 West Germantown Pike, Suite 460, Plymouth Meeting, Pennsylvania 19462. It issues policies and enters into insurance contracts with residents and businesses in the New York, New Jersey, Connecticut and Pennsylvania areas.

13.     Defendant TGH is the parent company for Defendant Tremont Capital (formerly Tremont Advisers, Inc. ("Tremont Advisers")), a fund of funds, and Defendant Tremont Partners. Defendant TGH has its principal place of business at 555 Theodore Fremd Avenue, Rye, New York, 10580. Defendant TGH manages roughly $6 billion in assets through its fund of hedge fund products and multi-manager portfolios, as well as its single-manager Defendant Rye. Defendant TGH has offices in New York, Toronto, London, and Hong Kong and is owned by Defendant Oppenheimer Acquisition Corporation ("Oppenheimer"), which is majority controlled by Defendant Massachusetts Mutual Life Insurance Co.

- 4 -

14.     Defendant Tremont Capital is a fund of hedge funds wholly-owned by Defendant TGH. Defendant Tremont Capital has its principal place of business at 555 Theodore Fremd Avenue, Rye, New York, 10580. Defendant Tremont Capital provides investment services to Defendant TGH's clients.

15.     Defendant Tremont Partners is wholly-owned by Defendant TGH and its principal place of business is located at 555 Theodore Fremd Avenue, Rye, New York, 10580.

16.     Defendant Rye is a division of Defendant TGH that controlled assets of $3.1 billion, virtually all invested with Madoff. Defendant Rye has its principal place of business located at 555 Theodore Fremd Avenue, Rye, New York, 10580. Defendant Rye managed the Rye Select Funds.

17.     Defendants Rye, TGH, Tremont Capital, and Tremont Partners are at times referred to collectively herein as "Tremont."

18.     Defendant Oppenheimer is the parent company of Tremont and is headquartered at Two World Financial Center, New York, New York, 10281. Defendant Oppenheimer jointly marketed several funds with Defendant Tremont Partners and allowed them to use the Oppenheimer name on several funds operated by Defendant Tremont Partners.

19.     Defendant MassMutual Holding LLC is the parent company of Defendant Oppenheimer and its principal place of business is located at 1295 State Street, Springfield, Massachusetts, 01111.

20.     Defendant Massachusetts Mutual Life Insurance Co. is the parent company of Defendant MassMutual Holding LLC, which owns Defendant Oppenheimer. Defendant Massachusetts Mutual Life Insurance Co. is headquartered at 1295 State Street, Springfield, Massachusetts, 01111. In its 2007 10-K, Defendant Massachusetts Mutual Life Insurance Co. categorized Tremont as one of its "General Agency and Other Offices."

- 5 -

21.     MassMutual Holding LLC and Massachusetts Mutual Life Insurance Co. are collectively referred to herein as "MassMutual."

22.     Defendants AGL, Tremont, Oppenheimer and MassMutual are collectively referred to herein as "Defendants."

23.     Defendant Ernst & Young LLP ("Ernst & Young") is one of the largest professional services firms in the world and one of the "Big Four" auditors. Ernst & Young provides assurance and advisory business services, tax services and consulting for clients worldwide. Defendant Ernst & Young maintains it headquarters at Five Times Square, New York, New York, 10036. Ernst & Young failed to perform its annual audits of the financial statements and financial condition of the Rye Select Funds in accordance with professional standards applicable to those audits, as described herein.

24.     Defendant KPMG LLP ("KPMG") is one of the largest professional services firms in the world and one of the "Big Four" auditors. KPMG International, a firm based in Switzerland, is the parent of Defendant KPMG. Defendant KPMG maintains it headquarters at 757 Third Avenue, New York, New York 10017. KPMG replaced Defendant Ernst & Young as the auditor for the Rye Select Funds in 2004. KPMG failed to perform its annual audits of the financial statements and financial condition of the Rye Select Funds in accordance with professional standards applicable to those audits, as described herein.

25.     Defendant Sandra L. Manzke ("Manzke") was the founder of Tremont Partners and was its Chairman and Chief Executive Officer ("CEO") until April 2005, the co-CEO of TGH from 1994 until April 2005, and the Chairman of the Board and Co-CEO of Tremont Advisers until 2001. Defendant Manzke resides in New York.

26.     Defendant Robert Schulman ("Schulman") was the CEO of Tremont Partners from April 2005 to 2008, President and Co-CEO of TGH from 1994 through April 2005, and its CEO and

Chairman of the Board from April 2005 to July 2008. Defendant Schulman was the Co-Chief CEO of Tremont Advisers from 1994 to 2001. Defendant Schulman was the CEO of Rye, the division of Tremont Partners that managed the company's hedge funds, until July 2008. Defendant Schulman resides in New York City.

## SUBSTANTIVE ALLEGATIONS

27.     AGL offered variable universal life insurance policies, which are a form of life insurance also known as a cash value insurance policy. Variable universal life insurance policies are designed to allow policyholders to invest a portion of their premiums in optional investment accounts which are offered under the policy. Because the investments are held within a policy, gains inside the policy are shielded from income taxes, as is the payout upon death. An additional benefit is that policyholders can access their money during their lifetime by withdrawing or borrowing funds, tax free, from the policy.

28.     The risks associated with these policies are that: (i) poor performance could require increasing premiums to keep the policies in force; (ii) they may lapse if they do not have sufficient funding; and (iii) the policyholder cannot withdraw from the cash value during the policyholder's lifetime.

29.     Under the terms of the AGL Policies, Plaintiff and the Class were allowed to choose where the premiums that they paid would be invested. Plaintiff allocated the annual net premium payment to an investment account option entitled "American Masters Opportunity Insurance Fund, L.P. Account," which changed its name to the Tremont Opportunity Fund.

30.     As stated in the Policy, the objective of such account option was to achieve long-term capital appreciation and consistently generate positive returns irrespective of stock market volatility or direction while focusing on the preservation of capital. To achieve that objective, AGL offered a policy "investment strategy to invest with various portfolio managers believed to be able to meet the

- 7 -

Partnership's objective." The investment was targeted to insurance companies' high net worth clients.

31.     In connection with the selection of investment alternatives under the Policy, AGL provided to Plaintiff for its consideration and review the Second Amended and Restated Confidential Private Placement Memorandum dated August, 2008 (hereafter, the "Private Placement Memorandum") for the Tremont Opportunity Fund.

32.     The Private Placement Memorandum stated that the objective of the fund was to: (i) achieve long-term capital appreciation, and (ii) consistently generate positive return irrespective of stock market volatility or direction, while focusing on preservation of capital.

33.     As explained in both the Policy and the Private Placement Memorandum, the owners of variable life insurance contracts issued by the insurance companies could opt to have the insurance company invest their premiums in the Tremont Opportunity Fund. The Policy owners, however, were expressly restricted from any contact or communication, either direct or indirect, with the general partner, Tremont Partners, and with the Tremont Opportunity Fund. Thus, Plaintiff was barred from having any communication with the general partner or the Tremont Opportunity Fund; only Defendant AGL could have any communication or contact with the general partner or the Tremont Opportunity Fund.

34.     AGL knew, or should have known, how important it was to analyze and evaluate any prospective manager of the investments of the Tremont Opportunity Fund as each manager chosen by the general partner was to be granted full discretion over all matters relating to the manner, method and timing of investment and trading transactions with respect to the Tremont Opportunity Fund assets allocated to the manager, subject to the investment objectives, policies and restrictions related to the Tremont Opportunity Fund or as "otherwise communicated to the manager by the general partner."

- 8 -

35. AGL represented, through the Private Placement Memorandum, that "[t]he general partner believes, that given its alternative investment market experience, it should be able to obtain sufficient information about potential managers or investment vehicles to select them effectively." As expressly provided in the Private Placement Memorandum, the general partner is accountable to the Tremont Opportunity Fund as a fiduciary and consequently must exercise good faith and integrity in the handling of the Tremont Opportunity Fund's affairs.

36. AGL, by issuing the Private Placement Memorandum and the partnership agreement of the Tremont Opportunity Fund to Plaintiff and other Class members and publishing to Plaintiff and other Class members the statements made therein, misled Plaintiff and other Class members because the investments made by it of Plaintiff's and other Class members' funds were not ultimately invested pursuant to the investment strategy outlined as set forth above. Rather, the Tremont Opportunity Fund deposited its funds in the Rye Select Funds, and ultimately in Madoff, as managers of the funds and these funds were subject to Madoff's Ponzi scheme by which the funds were not invested, but held by Madoff and ultimately lost.

37. AGL conveyed the false impression that it conducted a thorough investigation and due diligence review of the managers of the funds in which Plaintiff's and other Class members' premiums were to be invested. In reality, AGL did not conduct a comprehensive due diligence review and ignored the warnings that would have alerted it to Madoff's Ponzi scheme.

38. On December 10, 2008, Madoff allegedly told his two sons that the asset management arm of his firm was a giant Ponzi scheme that bilked investors of approximately $65 billion. Madoff's sons alerted the FBI and, the following day, Madoff, a former Chairman of the National Association of Securities Dealers' NASDAQ and a former member of its Board of Governors, was arrested and charged with violations of the antifraud provisions of the federal securities laws. The Securities and Exchange Commission ("SEC") immediately filed an emergency action in the

- 9 -

Southern District of New York seeking to cease all ongoing offerings of securities and investment

advisory fraud by Madoff and BMIS.  The SEC alleged in its moving papers that:

> Madoff is a resident of New York City and is the sole owner of BMIS.  BMIS'
> website indicates that Madoff founded BMIS in the early 1960s and that he is an
> attorney.  Madoff is a former Chairman of the board of directors of the NASDAQ
> stock market.  BMIS is both a broker-dealer and investment adviser registered with
> the Commission.  Madoff oversees and controls the investment adviser services at
> BMIS as wells at the overall finances of BMIS.  The most recent Form ADV for
> BMIS filed in January 2008 with the Commission listed BMIS has having over $17
> billion in assets under management.  BMIS is a broker-dealer and investment advisor
> registered in both capacities with the Commission.  BMIS engages in three different
> operations, which include investment adviser services, market making services and
> proprietary trading.   BMIS website states that is has been providing quality
> executions for broker-dealers, banks and financial institutions since its inception in
> 1960;" and that BMIS, "[w]ith more than $700 million in firm capital, Madoff
> currently ranks among the top 1% of US Securities firms."  Since at least 2005,
> Madoff and BMIS have been conducting a Ponzi-scheme through the investment
> adviser services of BMIS.  Madoff conducts certain investment advisory business for
> clients that are separate from the BMIS' proprietary trading and market making
> activities.
>
> Madoff ran his investment adviser business from a separate floor in the New York
> offices of BMIS.  Madoff kept the financial statements for the firm under lock and
> key, and was "cryptic" about the firm's investment advisory business when
> discussing the business with other employees of BMIS.  In or about the first week of
> December, Madoff told Senior Employee No. 2 that there had been requests from
> clients for approximately $7 billion in redemptions, that he was struggling to obtain
> the liquidity necessary to meet those obligations, but that he thought that he would be
> able to do so.  According to the Senior Employees, they had previously understood
> that the investment advisory business had assets under management on the order of
> between approximately $8-15 billion.
>
> According to a Form ADV filed by Madoff, on behalf of BMIS, with the
> Commission on or about January 7, 2008, Madoff s investment advisory business
> served between 11 and 25 clients and had a total of approximately $17.1 billion in
> assets under management.
>
> At Madoff's Manhattan apartment, Madoff informed the Senior Employees, in
> substance, that his investment advisory business was a fraud.  Madoff stated that he
> was "finished," that he had "absolutely nothing," that "it's all just one big lie," and
> that it was "basically, a giant Ponzi scheme."  In substance, Madoff communicated to
> his Senior Employees that he had for years been paying returns to certain investors
> out of the principal received from other, different, investors.  Madoff stated that the
> business was insolvent, and that it had been for years.  Madoff also stated that he
> estimated the losses from this fraud to be at least approximately $50 billion.  One of
> the Senior Employees has a personal account at BMIS in which several million had

- 10 -

been invested under the management of Madoff. At Madoff's Manhattan apartment, Madoff further informed the Senior Employees that, in approximately one week, he planned to surrender to authorities, but before he did that, he had approximately $200-300 million left, and he planned to use that money to make payments to certain selected employees, family, and friends.

39.     Madoff perpetrated his fraudulent scheme through his New York and London offices, where directors and shareholders included family members and associates of Madoff. Madoff used his London office to launder over $250 million of client monies generated by his New York investment advisory business. The money was first transferred to London and then transferred back to the New York office to benefit Madoff personally and BMIS. These transfers gave the appearance that Madoff was trading his clients' monies in Europe – a false claim that Madoff proffered when probed by investors about his trading strategy.

40.     Shortly after Madoff's guilty plea, Madoff's auditor, David Friehling ("Friehling"), was charged by federal prosecutors with falsely certifying that he audited financial statements for BMIS. According to an article in *The Wall Street Journal* published on March 19, 2009, entitled "Accountant Arrested for Sham Audits," Friehling knowingly and improperly rubberstamped Madoff's financial statements without conducting a comprehensive audit:

> In the criminal complaint against Mr. Friehling, a Federal Bureau of Investigation agent said the auditor didn't verify the existence of assets that Mr. Madoff said he held or securities trades Mr. Madoff said he made. The agent also said Mr. Friehling didn't examine a bank account through which billions of dollars of client funds flowed, among other things.
>
> Mr. Friehling, 49 years old, was the sole auditor at Friehling & Horowitz, a storefront accounting firm in New City, N.Y., a New York City suburb. The government said he audited Mr. Madoff's financial statements since 1991. Since Mr. Madoff's arrest, auditing experts not involved in the case have said they were skeptical that one individual could have audited such a big company. Mr. Madoff's firm, which had several businesses, including a division that facilitated securities trades between investors, had $1.1 billion in assets, according to 2007 financial statements prepared by Mr. Friehling that were reviewed by The Wall Street Journal.
>
> In a separate civil complaint that mirrored the criminal charges, the SEC also alleged that Mr. Friehling and his family had investment accounts at the Madoff firm worth more than $14 million, a "blatant" conflict of interest that violated auditing rules,

- 11 -

according to the complaint. He and his family withdrew at least $5.5 million since 2000, the SEC said.

41.     On November 3, 2009, Friehling pleaded guilty to securities fraud, aiding and abetting investment advisor fraud, three counts of obstructing or impeding the administration of Internal Revenue laws and four counts of making false filings with the SEC. He admitted that he failed to conduct independent audits of BMIS's financial statements, saying he took the information given to him by Madoff or Madoff's employees at "face value."

42.     A reasonable due diligence inquiry into Madoff auditor's accounting practices would have alerted a reasonable investor to the Madoff Ponzi scheme. According to an opinion piece by the *Business Mirror* published on March 25, 2009, entitled "Missing An Easy Clue," it is "Due Diligence 101" to inquire into the auditor's accounting practices:

> Investors may have avoided about $74 billion in losses if they had examined – or just tried to shake hands with – accountants supposedly verifying the books.
>
> "Due Diligence 101 should demand that you check out the auditing firm and find out if it exists," said Richard Dietrich, an accounting professor at Ohio State University in Columbus. "Then, you have to find out if they are qualified."
>
>     *    *    *
>
> "Too many Larry, Moe & Curly accounting firms" are now auditing money managers, said James Cox, a law professor at Duke University in Durham, North Carolina. "While we made progress with accounting for reporting companies, we have not with investment advisers."
>
>     *    *    *
>
> Money managers should be required to disclose to regulators who audits their books, handles their trades and has custody of their assets, Cox said. Fund managers typically disclose those details privately to investors, who may try to independently verify them. Many don't.
>
> Friehling, Madoff's accountant, operated from an office in the Georgetown Office Plaza, sandwiched between a medical practice and a pediatrician's office. Prosecutors and the SEC said Friehling, 49, vouched for Madoff's books without taking meaningful steps to verify them.

- 12 -

43.   On or about December 12, 2008, Plaintiff received notification from Defendant Tremont that the portion of Plaintiff's account attributable to investments in accounts controlled by Madoff was zero. Tremont's explanation for its claim that a portion of Plaintiff's account now had a zero value was that the monies had been lost through the fraudulent schemes of Madoff, by which Plaintiff's monies had in fact never been invested in the securities and strategies described by the Policy, and as represented by Defendants Tremont and AGL.

44.   By the express terms of the Policy, only "income, gains and losses from each Investment Account" were to be charged against that account, "without regard to the income, gains or losses of any other Investment Account and without regard to any of our other income gains or losses." Thus, by the express terms of the Policy, as well as a matter of law, absent legitimate investment losses, Plaintiff's account value should have been the amount determined by the provisions set forth above, *i.e.*, the amounts deposited, minus certain charges.

### Despite Numerous "Red Flags," Defendants
### Failed to Perform an Adequate Due Diligence Review

45.   According to Tremont's official website:

Tremont has been at the forefront in setting the standard in the industry for fund of hedge funds investment management. Effective investment strategies and oversight, thorough manager research, *careful due diligence*, advanced risk allocation and time-tested portfolio management form the cornerstones of a comprehensive platform that has been refined over a 23-year span of dedicated strides to maximize our clients' objectives. Our established performance history and our focus on client service distinguishes the firm at a time when the influx of new entrants creates choice but not the certainty of experience.

(Emphasis added).

46.   This due diligence was simply not performed or was performed in an improper manner. Hedge funds are complex investment funds that often lack transparency and the mere disclosure of a fund's investment holdings would not adequately reveal the types and magnitudes of risks a hedge fund manager undertakes. Accordingly, the unique and complex nature of hedge funds

- 13 -

requires a level of robust, proactive due diligence above and beyond what is required for more transparent investments that are strictly regulated.

47.     Particular care must be exercised in due diligence of hedge managers and their funds, because of: (i) their more complex investment strategies; (ii) the possibilities of concentrated exposure to market and counterparty risks; (iii) their use of leverage and the associated risks; and (iv) the light regulation of these firms. Fund of funds, such as Tremont, have a fiduciary duty to understand how a hedge manager/fund may perform in a variety of future scenarios and to review its organizational culture, internal economic incentives and conflicts-of-interests.

48.     On the flipside of the "due diligence coin," monitoring a hedge manager/fund is a continuation of the initial, fiduciary-grounded due diligence process. While the initial due diligence serves to qualify a hedge fund as a desirable investment, the ongoing monitoring process continually and periodically reconfirms that the conclusions and assumptions used in the initial evaluation and selection remain valid. Fiduciaries and institutional investment staff and consultants should take reasonable steps to identify any events or circumstances that may result in the hedge manager/fund failing to meet the standards and expectations that were originally required in the selection process.

49.     Had Defendants Tremont and AGL performed an adequate and comprehensive due diligence review of Madoff and BMIS, they would have noticed big "red flags," which would have alerted them of the Madoff Ponzi scheme.

50.     In fact, Harry Markopolos, a former money manager based in Boston, started complaining to the SEC in 2000 that Madoff was either front-running his clients' money or operating a Ponzi scheme. In a 19-page document sent to the SEC in November 2005, entitled "The World's Largest Hedge Fund is a Fraud," he argued that it was impossible for Madoff's firm to collect as much money as it did from feeder funds and still execute his stated split-strike strategy, and

- 14 -

identified 29 "red flags" that should have raised doubts about Madoff's alleged investment strategy. Amongst these "red flags" were:

(a)     Madoff's fund structure – unlike most private pooled investments by which the investor is charged a fee by a fund manager, most investors with Madoff were invested in secondary fund of funds, such as Tremont, and were charged management fees by the respective fund of funds, not by Madoff.  Notwithstanding the fact that Madoff could easily have collected management or performance fees, Madoff chose to forego millions of dollars in fees and only collected "market rate" commissions charged on each trade;

(b)     Madoff's secrecy – the investors that invested with these fund of funds were usually unaware that their funds are invested with Madoff.  This secrecy plus the deregulation of the entire hedge fund industry allowed Madoff to promise lucrative returns that went unverified. Moreover, Madoff's trade tickets went unverified;

(c)     The investment strategy produced mathematically improbable returns – the total amount of call options outstanding was not nearly enough to generate $65 billion of assets under management.  Moreover, the price percentages at which Madoff claimed to purchase the put options were unreasonably under-priced as "there were not enough option put contracts in existence to hedge the way Madoff was hedging";

(d)     Compelling media releases that questioned Madoff's strategy – on May 7, 2001, *Barron's* published an article, entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum," which listed numerous "red flags," including the specious double-digit returns using the "split-strike conversion" strategy.  A May 2001 article in *Mar/Hedge*, entitled "Madoff Tops Charts; Skeptics Ask How," identified many financial professionals who questioned the source and consistency of Madoff's returns;

- 15 -

(e)     Madoff's consistency in creating double-digit returns for his investors – as of 2001, Fairfield Sentry, a fund of funds invested primarily in Madoff, had only four months of losses since its inception in 1989;

(f)     Madoff's illegal manipulations – Madoff boasted to other feeder funds that he subsidized returns in down quarters to maximize reported performance and minimize risk, which in and of itself is an illegal manipulation of his accounting books and records;

(g)     Madoff's auditor was obscure and ill-equipped – Madoff was audited by a small auditor in Rockland County, New York, Friehling & Horowitz ("F&H"), a three-employee accounting firm, as opposed to the 90% of single strategy hedge funds that are audited by one of the top ten auditoring firms. F&H's staff consisted of Jerome Horowitz (a partner who lived in Miami), a secretary and one active accountant, Friehling.  Additionally, while F&H purportedly audited BMIS, F&H had filed annual forms with The American Institute of Certified Public Accountants ("AICPA") attesting that it had not performed audits for the past 15 years. The AICPA conducted an ethics investigation into F&H and announced that, as a result, it had expelled Friehling.  Federal investigators have issued a subpoena to F&H and have requested documents going back to 2000. Friehling was arrested by authorities for his improper audits and faces up to 100 years in prison if convicted of the felony charges levied against him;

(h)     Madoff's lack of segregation amongst service providers – Madoff did not use an independent custodian and by both directing trades as money manager and keeping track of the funds as custodian, Madoff was in a unique position to be able to falsify his accounting records. Additionally, the comptroller of BMIS was based in Bermuda, while most mainstream hedge fund investment advisers have their comptroller in-house;

(i)     Madoff's close familial relationships – only Madoff family members were privy to his investment strategy and the Madoff family held high positions with the NASD,

NASDAQ, SIA, DTC and other prominent industry bodies. Therefore these organizations would not be inclined to doubt or investigate Madoff or BMIS;

(j)     Madoff's incoherent 13F filings – 13F filings are required for investment managers who manage over $100 million or more of assets and disclose the class of securities, the CUSIP number, the number of shares owned and the total market value of each security. Madoff's 13F disclosures usually contained only smatterings of small positions in small equities and his explanation for this was that his strategy was mostly in cash at the end of each quarter to avoid disclosing the securities he was trading. However, had Madoff been doing as he said, there would have been massive movements on money markets and there were no such movements in these markets; and

(k)     BMIS's office in the Lipstick Building in New York – Madoff's secret operation took up about three-quarters of the 17th floor of the oval-shaped Lipstick Building in Manhattan. Most Madoff employees on other floors didn't have access to the space. Thus, anyone performing a proper due diligence would have questioned why all of the hedge fund's files were being quarantined in an inaccessible floor of the building. In its regulatory filings, BMIS indicated that it had only between one and five employees managing a disclosed $17 billion of assets under management.

51.     Had Plaintiffs and the Class known that Defendants would knowingly or recklessly ignore these numerous "red flags," they would have never permitted their Policies to be invested in the Rye Select Funds.

**Other Prudent Advisors Stopped Investing with**
**Madoff Following Their Due Diligence Review of BMIS**

52.     Prudent investment advisors, investment banks and pension funds – *i.e.,* JPMorgan Chase & Co., Fort Worth and Acorn Partners – took the time and effort to conduct comprehensive and proper due diligence reviews on Madoff and, as a result of these warning signs, chose not to

- 17 -

invest or to maintain their earlier investments with Madoff or any of his affiliated funds.  In stark contrast, Defendants failed to even conduct a rudimentary due diligence review that would have alerted them of Madoff's fraudulent scheme.

53.     An article published in *The New York Times* on January 29, 2009, entitled "JPMorgan Exited Madoff-Linked Funds Last Fall," stated, in relevant part, that:

> As early as 2006, the bank had started offering investors a way to leverage their bets on the future performance of two hedge funds that invested with Mr. Madoff. To protect itself from the resulting risk, the bank put $250 million of its own money into those funds.
>
> But the bank suddenly began pulling its millions out of those funds in early autumn, months before Mr. Madoff was arrested, according to accounts from Europe and New York that were subsequently confirmed by the bank. The bank did not notify investors of its move, and several of them are furious that it protected itself but left them holding notes that the bank itself now says are probably worthless.
>
> A spokeswoman, Kristin Lemkau, said the bank withdrew from the Madoff-linked funds last fall after "a wide-ranging review of our hedge fund exposure."  Ms. Lemkau acknowledged, however, *that the bank also "became concerned about the lack of transparency to some questions we posed as part of our review."*

(Emphasis added.)

54.     An article published in *BusinessWeek* on December 31, 2008, entitled "The Madoff Case Could Reel in Former Investors," stated, in relevant part, that:

> The managers of the Fort Worth Employees' Retirement Fund thought they had dodged a bullet when Bernard L. Madoff was arrested on Dec. 11 for alleged fraud. Just a few months earlier the $1.7 billion public pension plan had pulled $10 million out of a hedge fund that invested exclusively with Madoff.  But now the managers face the possibility of having to give back the money – a sum that includes all of the pension's purported gains over the years plus its initial investment.
>
> \*      \*      \*
>
> Some investors may not have known what they were buying.  The Fort Worth pension fund, for example, owned the Rye Select Broad Market, a hedge fund managed by the Tremont Group. *The Rye marketing literature rarely, if ever, mentioned Madoff by name, even though his fund was the only investment.* Says Steven Caruso, a lawyer for a number of Tremont investors: "Some investors may be facing the prospect of a financial death sentence if they're forced to return funds." In

a letter to investors, Tremont's managers say they "exercised appropriate due diligence."

\*        \*        \*

Managers of the Fort Worth pension fund, who first invested with Rye five years ago, *started to rethink their investment in early 2008 after hiring Albourne Partners, a London due diligence firm, to assess their hedge fund portfolio. The Rye fund raised red flags almost immediately. Albourne's managing director, Simon Ruddick, says the firm, which had long-standing concerns about Madoff's trading strategy and consistent returns, had urged clients for nearly a decade to avoid affiliated funds such as Rye.*

(Emphasis added.)

55.      An article published in *The New York Times* on December 17, 2008, entitled "Look

Back at Wall St. Wizard Finds Magic Had Its Skeptics," quoted Robert Rosenkranz, a principal at

Acorn Partners, an investment advisory firm, who stated:

Our due diligence, which got into both account statements of his customers, and the audited statements of Madoff Securities, which he filed with the S.E.C., made it seem highly likely that the account statements themselves were just pieces of paper that were generated in connection with some sort of fraudulent activity.

56.      An article published in *The New York Times* on December 17, 2008, entitled

"European Banks Tally Losses Linked to Fraud," stated, in relevant part, that:

Société Générale, itself the victim of an apparent scam early this year when unauthorized bets by a trader, Jérôme Kerviel, caused a $7 billion loss, was not the only financial firm to think Mr. Madoff's unfailing record was too good to be true, said Drago Indjic, a project manager at the Hedge Fund Center of the London Business School.

*"Madoff did not pass due diligence for many European hedge fund companies," Mr. Indjic said. "Experienced people know there are many ways to provide the kind of return stream offered by Madoff, almost like a bank account, and one of them is a Ponzi scheme."*

*Smaller American investment advisory firms like Acorn Partners and Aksia also spotted problems with Mr. Madoff's strategy early on, but Société Générale is the first major investment player known to have steered clients away him.*

Mr. Indjic said the scheme revealed not only faulty due diligence, but also a basic failure to diversify. "If you had half a percentage point of total assets under management with one firm, that is more typical," he said. "But some had much,

- 19 -

much more than that with Madoff, so their due diligence failure was compounded by poor portfolio management."

(Emphasis added.)

**Defendants Unjustly Reaped Millions of Dollars in Management Fees**

57.     Defendants have charged management fees to Plaintiff and the Class for managing the affairs of the funds. As with other investment funds, the management fee was calculated as a percentage of the funds' net asset value.

58.     Defendant AGL collected these fees improperly, as it mismanaged the investments made by Plaintiff and the Class. By failing to perform an adequate and comprehensive due diligence review into Madoff's practices, Defendants breached their fiduciary obligations and collected these fees improperly.

**Defendants Immediately Disclaim<br>Responsibility for Any Losses Suffered**

59.     Egregiously, Defendants wasted no time in immediately claiming that they were caught unaware of the massive Ponzi scheme perpetrated by Madoff and BMIS. As discussed more fully herein, had Defendants properly performed any operational due diligence review and/or quantitative analysis, "red flag" warning signs would have alerted them to this Ponzi scheme.

60.     On December 12, 2008, Defendant TGH sent out a letter to its clients, which stated, in relevant part, as follows:

Dear Client:

On Thursday December 11th Bernard L. Madoff, founder of Bernard L. Madoff Investment Securities LLC was arrested by U.S. federal law enforcement and charged with a single count of securities fraud. The Securities and Exchange Commission (SEC) also charged Mr. Madoff with securities fraud.

We have obtained and reviewed a copy of the federal complaint and the SEC charges in order to understand the allegations against .Mr. Madoff. Needless to say, our level of anger and dismay over the apparent betrayal by Mr. Madoff and his organization of his 14-year relationship with Tremont is immeasurable. By all accounts he headed a credible and respected organization, with investors making tens of billions of

- 20 -

dollars of commitments to the firm. Mr. Madoff also personally served as Vice Chairman of the NASD and was a member of NASDAQ's stock market's board of governors and its Executive Committee.

Your multi-strategy portfolio had exposure to Madoff Investment Securities through the Rye Select Broad Market Series.

Be assured that we arc aggressively taking all the necessary steps to identify and recover your and our investments. We have retained legal counsel, Skadden, Arps, Slate, Meagher & Flom LLP, and through our lawyers arc communicating with law enforcement and the SEC in order to understand this situation and gather the relevant facts. Our repeated attempts to contact the Madoff organization were not acknowledged.

We will continue to update you as events unfold.

Tremont Group Holdings

61.    On December 14, 2008, Defendant TGH sent out a letter to its clients, which stated,

in relevant part, as follows:

Re: Madoff Fraud

As you are aware, news reports following the arrest of Bernard L. Madoff about the scope and scale of his alleged scheme characterize it, in the words of the SEC, as "a stunning fraud that appears to be of epic proportions." If we can come to any conclusion at this early stage in this matter, it is that it seems we were all victimized by not just a person but a scheme and a complex process designed to deceive individuals and organizations, managers and analysts — including some of the largest, most sophisticated financial institutions in the world.

We believe Tremont exercised appropriate due diligence in connection with the Madoff investments. We are working with our legal counsel and communicating with law enforcement and other government authorities to gather information about the nature of the fraud and the assets affected by it. We restate our commitment to do everything in our power to identify and recover your and our investments. We arc considering all our options, including legal action.

We will keep you informed of developments as they occur.

Tremont Group Holdings

62.    On or about December 24, 2008, Plaintiff and other policyholders received a letter

from Defendant TGH, which stated, in pertinent part, as follows:

Dear Investor:

- 21 -

Attached are estimated NAVs for the Tremont funds based on 11/30/08 estimated values. These estimates include a write down of the Madoff investments to zero. This is only an estimate based on our current knowledge of the situation. This is not a final NAV, and none will be provided until further notice.

In addition, we have questions regarding the tax treatment in 2008 of the funds' investment in the Rye Select Broad Market series funds within the Tremont Multistrategy portfolios. We are working on this issue with the IRS through our outside counsel, Skadden, Arps, Slate, Meagher and Flom LLP and other appropriate parties on the matter. Our investors should consult with their own individual tax advisors for further assistance.

We will update you on any new developments in connection with the above matter. We appreciate your patience during this time.

Sincerely,

Tremont Group Holdings, Inc.

63. On January 21, 2009, Plaintiff and other policyholders received a letter from Defendant Tremont Opportunity Fund, which stated, in pertinent part, as follows:

Re: Tremont Opportunity Fund III, L.P. (the "Partnership")

Dear Limited Partners:

As you know, as a result of the Partnership's exposure to the fraud of Bernard L. Madoff and his investment firm Bernard L. Madoff Investment Securities, LLC or one of more of its affiliates (collectively, "BLMIS Products"), as well suspensions of the calculation of net asset value, suspension of or limitations on redemptions or similar actions by a number of investment funds in which the Partnership has invested. In December the Partnership declared a temporary suspension of withdrawals by Limited Partners and the payment of withdrawal proceeds to Limited Partners.

With respect to a small proportion of the Limited Partner interests, the Partnership received withdrawal notices that were effective as of November 30, 2008 ("November 30 Withdrawals"). Because the effective date of the November 30 Withdrawals was prior to the Partnership's suspension of withdrawals in mid-December, Limited Partners who effected November 30 Withdrawals are entitled to receive withdrawal proceeds based upon the net asset value of their withdrawn Partnership interests as of November 30 and will be paid the amounts owed to them as promptly as practicable after the determination of the net asset value of the Partnership as of that date, subject to the establishment of appropriate reserves.

Limited Partners who did not effect November 30 Withdrawals have now submitted withdrawal notices with respect to almost all of the Partnership's Capital Accounts,

- 22 -

effective (subject to the suspension noted above) on or before February 28, 2009. As a result, the partnership's General Partner has determined that it is no longer practicable to maintain the Partnership in business to manage the limited assets attributable to the Capital Accounts of those few Limited Partners who have not submitted withdrawal notices. Accordingly, in order to facilitate the orderly honoring of withdrawal notices and the attendant liquidation of the Partnership's assets, the General Partner has-determined that it is the best interests of the Partnership to require the full withdrawal from the Partnership of all Limited Partners who have not previously submitted withdrawal notices, effective at the same time as all other outstanding withdrawal notices. Correlatively, Limited Partners whose withdrawal notices would have been effective, but for the temporary suspension of withdrawals in mid-December, at the end of December or January will be deemed to have withdrawn at the same time as all other Limited Partners who did not effect November 30 Withdrawals.

The Partnership will liquidate its assets and begin pro rata distributions of cash as promptly as practicable. Because the Partnership considers withdrawals to be effective with respect to all Limited Partners' Capital Accounts, the General Partner may determine that a date earlier than February 28 should be deemed the withdrawal date for purposes of commencing the distribution of withdrawal payments (subject to the establishment of appropriate reserves). The Partnership notes, however, that, as a result of the suspensions and limitations on withdrawal noted above by a number of the Partnership's portfolio investment funds and the impracticability or impossibility of disposing of interests in such funds in secondary market transactions, the Partnership will not immediately be able to liquidate certain of the Partnership's assets. The Partnership will make pro rata distributions of the cash received upon the liquidation of such portfolio interests as promptly as practicable and reserves the right to make a final in-kind distribution of assets although it does not currently expect to take that step.

The extent of the recovery, if any, that will be achieved from the Partnership's exposure to BLMIS Products remains unclear, Because the value of the Partnership's interest in BLMIS Products has been written down to zero as of November 30, 2008, if and to the extent that any such recovery is achieved, the Partnership will allocate the proceeds so received to the Limited Partners pro rata based upon their respective Interests in the Partnership as of November 30.

Sincerely,

Tremont Opportunity Fund III, LP.

64.     As a direct result of Defendants' illegal conduct, Plaintiff and the Class have

witnessed their investment accounts wiped out and the values of their Policies disappear. Had

Plaintiff and the Class known that Defendants Tremont and AGL would knowingly or recklessly

- 23 -

ignore numerous "red flags" and invest their funds imprudently, they would have never invested their monies and/or Policies in the Rye Select Funds.

**Defendants Ernst & Young and KPMG Failed**
**to Perform Their Functions as Auditors to the Rye Select Funds**

65.    Defendants Ernst & Young and KPMG also failed to perform their functions as auditors to the Rye Select Funds in a proper manner consistent with the standards of Generally Accepted Auditing Standards ("GAAS").

66.    Defendants Ernst & Young and KPMG knowingly or recklessly disregarded: (i) that the investments were heavily concentrated in a single sub-manager; (ii) that there was substantial risk involved in investing in Madoff's secretive and fraudulent Ponzi scheme; (iii) that Madoff's returns were unable to be replicated by others in the financial industry; and (iv) all of the other "red flags" identified herein.

67.    Ernst & Young's and KPMG's failure to audit in a proper manner amounts to gross negligence and is in violation of GAAS and the standards of the accounting and auditing industry. In particular, Ernst & Young and KPMG are in violation of:

(a)    AU §230 – by failing to use due professional care in the performance of their audits;

(b)    AU §311 – by failing to properly plan their audits;

(c)    AU §314 – by failing to understand the entity and its environment and in assessing the risk of material misstatement;

(d)    AU §316 – by failing to maintain an appropriate degree of skepticism in the performance of their audits;

(e)    AU §326 – by failing to obtain sufficient evidence to support their opinions about the conformity of the Rye Select Funds' financial statements to GAAS; and

- 24 -

(f)     AU §332 – by failing to assess the Rye Select Funds' accounting done by

Madoff as the investment advisor.

68.     Defendants Ernst & Young and KPMG issued annual audit reports to the Rye Select

Funds.  In those annual reports, Defendants Ernst & Young and KPMG represented that these audits

were conducted and prepared in accordance with GAAS.

69.     Defendants Ernst & Young and KPMG issued false statements in their annual audit

reports as the audits they performed did not conform to GAAS.

70.     Had Defendants Ernst & Young and KPMG performed their audit functions in a

reasonably acceptable manner, they would have been alerted by the "red flags" of the Madoff Ponzi

scheme.

### Tremont Shuts Down Defendant Rye

71.     An article published in *FINalternatives* on January 27, 2009, entitled "Tremont

Closes Rye After Madoff Losses," stated that:

> Tremont Group Holdings has shuttered its Bernard Madoff-scarred Rye Investment
> Management division, it said yesterday.
>
> The New York-based firm has suspended the operations of Rye, its single-manager
> hedge fund unit that had all of its assets under management invested with Madoff,
> who was charged last year with running a $50 billion Ponzi scheme.  Before the
> scandal broke, the Rye, N.Y.-based unit managed $3.1 billion.
>
> The decision to close Rye is part of a broader restructuring of Tremont "to reflect
> market conditions and the reduced amount of assets under management," the
> MassMutual unit said in a statement.  In addition to Rye's losses, Tremont's fund of
> hedge funds unit, Tremont Capital Management lost some $190 million invested with
> Madoff.
>
> Tremont made clear that the closure of Rye did not mean the foreclosure of attempts
> to recoup its losses in court.
>
> "While the Rye Investment Management unit is permanently suspended, it also
> retains the staff necessary to seek to recover any available Madoff assets," the firm
> said.

- 25 -

## CLASS ACTION ALLEGATIONS

72.     Plaintiff brings this action as a class action on behalf of all persons or entities that held Policies issued by Defendant AGL and managed by Defendant Tremont Capital and/or Defendant Rye through December 10, 2008. Excluded from the Class are Defendants, and any entity in which Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries, and/or assigns of any such individual or entity.

73.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are thousands of members of the Class.

74.     Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained competent counsel experienced in class action litigation under the laws of New York; it is a member of the Class, its claims are typical of the claims of all Class members, and it does not have interests antagonistic to, or in conflict with, those of the Class.

75.     There are numerous questions of law and fact which are common to the Class and which predominate over any questions affecting individual members of the Class, including:

(a)     whether Defendants Tremont and AGL breached their fiduciary duties to Plaintiff and the Class by failing to properly manage their investments and to perform necessary due diligence that would have uncovered the massive Ponzi scheme carried out by Madoff, and his company, BMIS, and the wrongful dissipation of the assets of Plaintiff and the Class;

(b)     whether and to what extent Plaintiff and the Class were damaged by Defendants Tremont and AGL's breaches of fiduciary duty;

- 26 -

(c)     whether Defendants Tremont and AGL were grossly negligent in failing to perform necessary due diligence that would have uncovered the massive Ponzi scheme carried out by Madoff and BMIS;

(d)     whether and to what extent Plaintiff and the Class were damaged by Defendants Tremont and AGL's gross negligence;

(e)     whether Defendants Tremont and AGL breached their fiduciary duties to Plaintiff and the Class by making Tremont-managed funds an acceptable investment option without conducting a comprehensive due diligence review;

(f)     whether Defendants Tremont and AGL's conduct was in violation of fiduciary duties owed to Plaintiff and the Class and therefore in violation of the law governing fiduciaries;

(g)     whether Defendants Oppenheimer, MassMutual, Ernst & Young and KPMG aided and abetted the breaches of fiduciary duties owed to Plaintiff and the Class;

(h)     whether Defendants Tremont and AGL were unjustly enriched at the expense of Plaintiff and the Class;

(i)     whether it is appropriate to create a constructive trust to hold fees paid to Defendants;

(j)     whether management and performance fees were paid based on a mutual mistake of the parties; and

(k)     the extent of damages sustained by Plaintiff and the Class and the proper measure of such damages.

76.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since a multiplicity of actions could result in an unwarranted burden on the Court system and could create the possibility of inconsistent judgments. Moreover, a class

- 27 -

action will allow redress for many persons whose claims would otherwise be too small to litigate individually.  There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION

### For Breach of Fiduciary Duty
### Against Defendants Tremont and AGL

77.     Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

78.     Plaintiff and the Class invested their assets with Defendants Tremont and AGL and Defendants Tremont and AGL owed fiduciary duties to Plaintiff and the Class.

79.     As investment managers, Defendants Tremont and AGL knew or should have known how to perform their fiduciary obligations in monitoring the safety and performance of Plaintiff's and the Class' assets in a prudent and professional manner.

80.     Specifically, Defendants Tremont and AGL failed to conduct adequate and comprehensive due diligence reviews on the investment options that they offered to Plaintiff and the Class.  Defendants Tremont and AGL have, as a result, ignored numerous "red flags" that would have warned them of the fraudulent scheme perpetrated by Madoff and BMIS.  Defendants Tremont and AGL have further caused the dissemination of the false and misleading statements and omissions alleged herein.

81.     Defendants Tremont and AGL further breached the following fiduciary duties owed to Plaintiff and the Class:

(a)     the duty to deal fairly and honestly with Plaintiff and the Class;

(b)     the duty to act with reasonable care to verify the truthfulness of the information set forth in the written materials, including the monthly account statements, and other presentations communicated to and relied upon by Plaintiff and the Class;

(c)     the duty to oversee that the investment assets were made and maintained in a prudent and professional manner;

- 28 -

(d)      the duty to perform due diligence and to maintain oversight and transparency as to the activities of any fund manager that managed the investment assets; and

(e)      the duty to exercise the prudent and cautious judgment and best practices that would be expected of investment managers.

82.      As a direct and proximate result of Defendants Tremont and AGL's breaches of their fiduciary duties, Plaintiff and the Class have suffered damages and are entitled to such damages from Defendants Tremont and AGL, jointly and severally, as well as a return of all fees paid to Defendants Tremont and AGL.

83.      Defendants Tremont and AGL are further liable for punitive damages as a result of their wanton and grossly negligent course of conduct.

### SECOND CAUSE OF ACTION

**For Aiding and Abetting**
**Against Tremont, Oppenheimer and MassMutual**

84.      Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

85.      By virtue of their control over the Rye Select Funds, Defendants Tremont, Oppenheimer and MassMutual had intimate knowledge of and approved the issuance of the false and misleading statements complained of herein.

86.      Further, Defendants Tremont, Oppenheimer and MassMutual had actual knowledge of the breach of fiduciary obligations complained of herein. By virtue of their control, Defendants Tremont, Oppenheimer and MassMutual influenced the Rye Select Funds' decision to invest with Madoff and/or BMIS and also had the power to influence and control the content of the various account statements sent to Plaintiff and the Class that were false and misleading.

87.      As described above, Plaintiff and the Class have suffered substantial damages in connection with the misconduct caused by Defendants Tremont, Oppenheimer and MassMutual by aiding and abetting the beach of fiduciary obligations described herein.

- 29 -

### THIRD CAUSE OF ACTION

#### For Aiding and Abetting
#### Against Defendants Ernst & Young and KPMG

88.     Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

89.     Defendants Ernst & Young and KPMG owed Plaintiff and the Class certain fiduciary duties as alleged herein.

90.     By committing the acts alleged herein, Defendants Ernst & Young and KPMG have breached their fiduciary duties owed to Plaintiff and the Class.

91.     Defendants Ernst & Young and KPMG aided and abetted Defendants in breaching their fiduciary duties owed to Plaintiff and the Class.  Defendants Ernst & Young and KPMG colluded with or aided and abetted Defendants' breaches of fiduciary duties, and were active and knowing participants in Defendants' breaches of fiduciary duties owed to Plaintiff and the Class. Among other things, Defendants Ernst & Young and KPMG knowingly or recklessly ignored information that indicated or should have indicated that the monies invested by Plaintiff and the Class in the Rye Select Funds were being invested with Madoff and BMIS and that Madoff and BMIS were involved in a Ponzi scheme.

92.     Plaintiff and the Class shall be irreparably injured as a direct and proximate result of the aforementioned acts.

### FOURTH CAUSE OF ACTION

#### For Violations of General Business Law §349
#### Against Defendants Tremont and AGL

93.     Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

94.     Defendants Tremont and AGL's acts and conduct in furtherance of their scheme or artifice constitute deceptive acts and practices in the conduct of a business or in the furnishing of a

- 30 -

service, within the meaning of §349 of the New York General Business Law and, as such, are unlawful.

95.     Upon information and belief, the same acts and conduct used by Defendants Tremont and AGL to defraud Plaintiff and the Class have been used repeatedly and are of a recurring nature.

96.     The acts and conduct of Defendants, by which they knowingly fraudulently represented to potential purchasers the nature of the investments that Defendants Tremont and AGL were selling to Plaintiff, affect the public interest.

97.     As a result of Defendants' unlawful acts and conduct in violation of §349 of the New York General Business Law, Plaintiff and the Class have been damaged in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**

**For Gross Negligence Against Defendants Tremont and AGL**

98.     Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

99.     As investment managers with discretionary control over the assets entrusted to them by Plaintiff and the Class, Defendants Tremont and AGL owed Plaintiff and the Class a duty to manage and monitor the investments of Plaintiff and the Class with reasonable care.  Defendants Tremont and AGL breached this duty.

100.     Defendants Tremont and AGL further breached their duty of care by failing to:

(a)     take all reasonable steps to ensure that the investment of the assets of Plaintiff and the Class were made and maintained in a prudent and professional manner;

(b)     take all reasonable steps to preserve the value of Plaintiff's and the Class' investments;

(c)     perform all necessary and adequate due diligence; and

- 31 -

(d)     exercise generally the degree of prudence, caution, and good business practices that would be expected of any reasonable investment professional.

101.    As a direct and proximate result of Defendants Tremont and AGL's gross negligence, Plaintiff and the Class have suffered damages and are entitled to such damages from Defendants Tremont and AGL, jointly and severally.

## SIXTH CAUSE OF ACTION

### For Negligent Misrepresentation
### Against All Defendants

102.    Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

103.    This cause of action is brought against all Defendants based on negligent misrepresentation.

104.    Defendants owed Plaintiff and the Class a duty to act with reasonable care in connection with the assets entrusted to them by Plaintiff and the Class and to conduct due diligence to determine the accuracy and preparation of information contained in the Policy statements.

105.    Defendants Tremont and AGL breached these duties knowingly, wantonly, recklessly, or at least negligently, by including untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made reflecting the value of the monies and/or Policies, in light of the circumstances under which they were made, not misleading.

106.    Defendants Ernst & Young and KPMG knew that their annual audit reports would be provided to and relied upon by Tremont and its investors. Defendants Ernst & Young and KPMG owed a duty to Plaintiff and the Class to act with reasonable care when they conducted their audits of the Rye Select Funds and to use reasonable diligence in preparing the annual audit reports.

107.    At the time of the misrepresentations and omissions of material facts by Defendants, Plaintiff and the Class were ignorant of their falsity and believed them to be true. Plaintiff and the Class relied upon the representations made by Defendants. Neither the account statements nor any

- 32 -

of the other materials disseminated by Defendants ever disclosed the risks associated with investing with Madoff or BMIS. Had Plaintiff and the Class been aware of the true facts, Plaintiff and the Class would not have invested in the Rye Select Funds.

108.     Neither Plaintiff, Class members nor their agents knew of the falsity and/or misleading nature of Defendants' statements and omissions and, therefore, relied upon the representations made by Defendants.

109.     Defendants conduct constitutes the making of negligent misrepresentations (including negligent omissions to state facts in connection with statements that were made) under applicable state law. As a direct and proximate results of the negligent misrepresentations (and omissions) by Defendants, and in reliance thereon, Plaintiff and the Class have suffered damages in connection with their investment in the Rye Select Funds.

## SEVENTH CAUSE OF ACTION

### For Unjust Enrichment Against Defendants Tremont and AGL

110.     Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

111.     Defendants Tremont and AGL financially benefited from their unlawful acts as they collected improper management fees based on the Policies' net asset values. These unlawful acts caused Plaintiff and the Class to suffer injury and monetary loss.

112.     As a result, it is unjust and inequitable for Defendants Tremont and AGL to have enriched themselves in this manner.

113.     Each Defendant should pay its own unjust enrichment to Plaintiff and the Class.

114.     Plaintiff and the Class are entitled to restitution of the revenue derived and are entitled to the establishment of a constructive trust imposed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

- 33 -

## EIGHTH CAUSE OF ACTION

### For Promissory Estoppel Against Defendants Tremont and AGL

115.    Plaintiff incorporates each of the foregoing paragraphs as if fully set forth herein.

116.    This Count is asserted for promissory estoppel.

117.    Defendants Tremont and AGL made a clear and unambiguous promise in the documents and materials tendered to Plaintiff and the Class to conduct and perform due diligence and the continued monitoring of the fund managers with which it placed its clients' investments.

118.    Plaintiff and the Class reasonably relied upon these promises by Defendants Tremont and AGL in choosing to place their assets in the Rye Select Funds.

119.    As described herein, Plaintiff and the Class have suffered substantial damages in connection with Defendants Tremont and AGL's failure to perform their promises set forth in the documents and material tendered to Plaintiff and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually, and on behalf of the entire Class, prays for judgment as follows:

A.    declaring this action to be a proper class action;

B.    awarding Plaintiff and the other members of the Class damages suffered as a result of the wrongs complained of herein together with appropriate interest;

C.    awarding Plaintiff and the other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements;

D.    declaring that Defendants have unjustly enriched themselves and imposing a constructive trust to recoup Defendants' fees, unjust benefits and other assets for the benefit of Plaintiff and the Class; and

- 34 -

E.      awarding Plaintiff and the other members of the Class such other and further relief as may be just and proper under the circumstances.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury of all issues so triable.

DATED:  December 10, 2010             ROBBINS GELLER RUDMAN & DOWD LLP
                                      SAMUEL H. RUDMAN
                                      DAVID A. ROSENFELD
                                      MARIO ALBA, JR.
                                      EDWARD Y. KROUB


                                      DAVID A. ROSENFELD

                                      58 South Service Road, Suite 200
                                      Melville, NY  11747
                                      Telephone: 631/367-7100
                                      631/367-1173 (fax)

                                      Attorneys for Plaintiff

- 35 -

Index Number                                    Year

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

---

**YALE M. FISHMAN 1998 INSURANCE TRUST, Individually and On Behalf of All Others Similarly Situated,**

Plaintiff,

-against-

**AGL LIFE ASSURANCE COMPANY, RYE SELECT BROAD MARKET INSURANCE FUND LP, RYE SELECT BROAD MARKET PRIME FUND LP, RYE SELECT BROAD MARKET XL FUND LP, TREMONT CAPITAL MANAGEMENT, INC., TREMONT GROUP HOLDINGS, INC., TREMONT PARTNERS, INC., TREMONT OPPORTUNITY FUND III, L.P., RYE INVESTMENT MANAGEMENT, MASSMUTUAL HOLDING LLC, MASSACHUSETTS MUTUAL LIFE INSURANCE CO., OPPENHEIMER ACQUISITION CORP., ERNST & YOUNG, LLP, KPMG LLP, ROBERT SCHULMAN and SANDRA L. MANZKE,**

Defendants.

---

**COMPLAINT FOR BREACH OF FIDUCIARY DUTY, AIDING AND ABETTING, VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW §349, GROSS NEGLIGENCE, NEGLIGENT MISREPRESENTATION, UNJUST ENRICHMENT AND PROMISSORY ESTOPPEL**

---

Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

---

*Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the court of New York State, certifies that, upon information and belief and reasonable inquiry, the contentions contained in the annexed document are not frivolous.*

Dated: _December 10, 2010_                Signature _____

Print Signer's Name  DAVID ROSENFELD

# Exhibit B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

|  |  |
|---|---|
| YALE M. FISHMAN 1998 INSURANCE TRUST, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>-against-<br><br>AGL LIFE ASSURANCE COMPANY, RYE SELECT BROAD MARKET INSURANCE FUND LP, RYE SELECT BROAD MARKET PRIME FUND LP, RYE SELECT BROAD MARKET XL FUND LP, TREMONT CAPITAL MANAGEMENT, INC., TREMONT GROUP HOLDINGS, INC., TREMONT PARTNERS, INC., TREMONT OPPORTUNITY FUND III, L.P., RYE INVESTMENT MANAGEMENT, MASSMUTUAL HOLDING LLC, MASSACHUSETTS MUTUAL LIFE INSURANCE CO., OPPENHEIMER ACQUISITION CORP., ERNST & YOUNG, LLP, KPMG LLP, ROBERT SCHULMAN and SANDRA L. MANZKE,<br><br>Defendants. | : No. 11 Civ. _____<br>:<br>: Removed from:<br>: Supreme Court of the State of New York<br>: County of Nassau<br>: Index No. 601094/2010<br>:<br>:<br>:<br>: **NOTICE OF CONSENT TO**<br>: **REMOVAL**<br>: |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

PLEASE TAKE NOTICE that, based on the Complaint's allegations, Defendants

AGL Life Assurance Company, Rye Select Broad Market Insurance Fund LP, Rye Select Broad

Market Prime Fund LP, Rye Select Broad Market XL Fund LP, Tremont Capital Management,

Inc., Tremont Group Holdings, Inc., Tremont Partners, Inc., Tremont Opportunity Fund III, L.P.,

Rye Investment Management, MassMutual Holding LLC, Massachusetts Mutual Life Insurance

Company, Oppenheimer Acquisition Corporation, Ernst & Young, LLP, Robert Schulman and

Sandra L. Manzke, by and through their undersigned counsel, hereby consent to the Notice of

Removal to be filed on January 13, 2011 by KPMG LLP ("KPMG") ("Notice of Removal"),

which removes the above-captioned civil action, and claims and causes of action therein, from

the Supreme Court of the State of New York, County of Nassau, to the United States District

Court for the Eastern District of New York, pursuant to 28 U.S.C. §§ 1331, 1441, and 1446, for

all of the reasons set forth in the Notice of Removal and subject to and without waiving any

defenses and rights available to them.  A true and correct copy of the Notice of Removal is

attached hereto as Exhibit A.  As of January 13, 2011, only defendants AGL Life Assurance

Company, Ernst & Young, LLP, and KPMG have been served in this action.  With respect to the

defendants which have not yet been served, consent to removal does not waive any defenses

otherwise available to those defendants, including but not limited to, defenses based on service.

Dated: New York, New York
      January __, 2011


EDISON, McDOWELL &
HETHERINGTON LLP


By:_____
      Thomas F.A. Hetherington
      Phoenix Tower
      3200 Southwest Freeway
      Suite 2920
      Houston, TX 77027
      (713) 337-5583

      *Attorneys for Defendant AGL Life*
      *Assurance Company*


TANNENBAUM HELPERN SYRACUSE &
HIRSCHTRITT LLP


By:_____
      David J. Kanfer
      Jamie B.W. Stecher
      900 Third Avenue
      New York, NY 10022
      (212) 508-6719

      *Attorneys for Defendants Rye Select*
      *Broad Market Insurance Fund LP, Rye*
      *Select Broad Market Prime Fund LP, Rye*
      *Select Broad Market XL Fund LP, and*
      *Tremont Opportunity Fund III, L.P.*

2

Court for the Eastern District of New York, pursuant to 28 U.S.C. §§ 1331, 1441, and 1446, for

all of the reasons set forth in the Notice of Removal and subject to and without waiving any

defenses and rights available to them. A true and correct copy of the Notice of Removal is

attached hereto as Exhibit A. As of January 10, 2011, only defendants AGL Life Insurance

Company, Ernst & Young, LLP, and KPMG LLP have been served in this action. With respect

to the defendants which have not yet been served, consent to removal does not waive any

defenses otherwise available to those defendants, including but not limited to, defenses based on

service.

Dated: New York, New York
      January ___, 2011


EDISON, McDOWELL &
HETHERINGTON LLP

By: Tom F.A. Hetherington / by permission

    Thomas F.A. Hetherington
    Phoenix Tower
    3200 Southwest Freeway
    Suite 2920
    Houston, TX 77027
    (713) 337-5583

    *Attorneys for Defendant AGL Life*
    *Assurance Company*


TANNENBAUM HELPERN SYRACUSE &
HIRSCHTRITT LLP

By:_____

    David J. Kanfer
    Jamie B.W. Stecher
    900 Third Avenue
    New York, NY 10022
    (212) 508-6719

    *Attorneys for Defendants Rye Select*
    *Broad Market Insurance Fund LP, Rye*
    *Select Broad Market Prime Fund LP, Rye*
    *Select Broad Market XL Fund LP, and*
    *Tremont Opportunity Fund III, L.P.*

2

BINGHAM McCUTCHEN LLP

By:_____
Carol E. Head
One Federal Street
Boston, MA 02110-1726
(617) 951-8049

*Attorneys for Defendants MassMutual
Holding LLC and Massachusetts Mutual
Life Insurance Company*

SKADDEN, ARPS, SLATE MEAGHER &
FLOM LLP

By:_____
Jason Vigna
Four Times Square
New York, NY 10036
(212) 735-3000

*Attorneys for Defendants Tremont Capital
Management, Inc., Tremont Group Holdings,
Inc., Tremont Partners, Inc., and Robert
Schulman*

DECHERT LLP

By:_____
David A. Kotler
1095 Avenue of the Americas
New York, NY 10035-6797
(212) 698-3500

*Attorneys for Defendant Oppenheimer
Acquisition Corporation*

GIBSON, DUNN & CRUTCHER LLP

By:_____
Lawrence J. Zweifach
200 Park Avenue
New York, NY 10166-0193
(212) 351-2625

*Attorneys for Defendant Ernst & Young,
LLP*

KOBRE & KIM LLP

By:_____
Carrie A. Tendler
Jonathan D. Cogan
800 Third Avenue
New York, NY 10022
(212) 488-1239

*Attorneys for Defendant Sandra L.
Manzke*

3

BINGHAM McCUTCHEN LLP

By:_____
Carol E. Head
One Federal Street
Boston, MA 02110-1726
(617) 951-8049

*Attorneys for Defendants MassMutual
Holding LLC and Massachusetts Mutual
Life Insurance Company*

SKADDEN, ARPS, SLATE, MEAGHER &
   FLOM LLP

By:_____
Seth M. Schwartz
Jason C. Vigna
Four Times Square
New York, NY 10036
(212) 735-3000

*Attorneys for Defendants Tremont Capital
Management, Inc., Tremont Group Holdings,
Inc., Tremont Partners, Inc., Rye Investment
Management, and Robert Schulman*


DECHERT LLP

By:_____
   David A. Kotler
   1095 Avenue of the Americas
   New York, NY 10035-6797
   (212) 698-3500

   *Attorneys for Defendant Oppenheimer
   Acquisition Corp.*

KOBRE & KIM LLP

By:_____
   Carrie A. Tendler
   Jonathan D. Cogan
   800 Third Avenue
   New York, NY 10022
   (212) 488-1239

   *Attorneys for Defendant Sandra L.
   Manzke*


GIBSON, DUNN & CRUTCHER LLP

By:_____
   Lawrence J. Zweifach
   200 Park Avenue
   New York, NY 10166-0193
   (212) 351-2625

   *Attorneys for Defendant Ernst & Young,
   LLP*

3

BINGHAM McCUTCHEN LLP

By:_____
   Carol E. Head
   One Federal Street
   Boston, MA 02110-1726
   (617) 951-8049

*Attorneys for Defendants MassMutual*
*Holding LLC and Massachusetts Mutual*
*Life Insurance Company*

SKADDEN, ARPS, SLATE, MEAGHER &
   FLOM LLP

By:_____
   Seth M. Schwartz
   Jason C. Vigna
   Four Times Square
   New York, NY 10036
   (212) 735-3000

*Attorneys for Defendants Tremont Capital*
*Management, Inc., Tremont Group Holdings,*
*Inc., Tremont Partners, Inc., Rye Investment*
*Management, and Robert Schulman*

DECHERT LLP

By: *David A. Kotler*
   David A. Kotler
   1095 Avenue of the Americas
   New York, NY 10035-6797
   (212) 698-3500

*Attorneys for Defendant Oppenheimer*
*Acquisition Corp.*

KOBRE & KIM LLP

By:_____
   Carrie A. Tendler
   Jonathan D. Cogan
   800 Third Avenue
   New York, NY 10022
   (212) 488-1239

*Attorneys for Defendant Sandra L.*
*Manzke*

GIBSON, DUNN & CRUTCHER LLP

By:_____
   Lawrence J. Zweifach
   200 Park Avenue
   New York, NY 10166-0193
   (212) 351-2625

*Attorneys for Defendant Ernst & Young,*
*LLP*

3

BINGHAM McCUTCHEN LLP

By:_____
Carol E. Head
One Federal Street
Boston, MA 02110-1726
(617) 951-8049

*Attorneys for Defendants MassMutual
Holding LLC and Massachusetts Mutual
Life Insurance Company*


SKADDEN, ARPS, SLATE, MEAGHER &
   FLOM LLP

By:_____
Seth M. Schwartz
Jason C. Vigna
Four Times Square
New York, NY 10036
(212) 735-3000

*Attorneys for Defendants Tremont Capital
Management, Inc., Tremont Group Holdings,
Inc., Tremont Partners, Inc., Rye Investment
Management, and Robert Schulman*


DECHERT LLP

By:_____
David A. Kotler
1095 Avenue of the Americas
New York, NY 10035-6797
(212) 698-3500

*Attorneys for Defendant Oppenheimer
Acquisition Corp.*


KOBRE & KIM LLP

By:_____
Carrie A. Tendler
Jonathan D. Cogan
800 Third Avenue
New York, NY 10022
(212) 488-1239

*Attorneys for Defendant Sandra L.
Manzke*


GIBSON, DUNN & CRUTCHER LLP

By:_____
Lawrence J. Zweifach
200 Park Avenue
New York, NY 10166-0193
(212) 351-2625

*Attorneys for Defendant Ernst & Young,
LLP*

3

BINGHAM McCUTCHEN LLP

By:_____
Carol E. Head
One Federal Street
Boston, MA 02110-1726
(617) 951-8049

*Attorneys for Defendants MassMutual Holding LLC and Massachusetts Mutual Life Insurance Company*


SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By:_____
Seth M. Schwartz
Jason C. Vigna
Four Times Square
New York, NY 10036
(212) 735-3000

*Attorneys for Defendants Tremont Capital Management, Inc., Tremont Group Holdings, Inc., Tremont Partners, Inc., Rye Investment Management, and Robert Schulman*


DECHERT LLP

By:_____
David A. Kotler
1095 Avenue of the Americas
New York, NY 10035-6797
(212) 698-3500

*Attorneys for Defendant Oppenheimer Acquisition Corp.*


KOBRE & KIM LLP

By:_____
Carrie A. Tendler
Jonathan D. Cogan
800 Third Avenue
New York, NY 10022
(212) 488-1239

*Attorneys for Defendant Sandra L. Manzke*


GIBSON, DUNN & CRUTCHER LLP

By:_____
Lawrence J. Zweifach
200 Park Avenue
New York, NY 10166-0193
(212) 351-2625

*Attorneys for Defendant Ernst & Young, LLP*

3